**Sharon BAKER and Daryl Cole, Appellant (Defendant below),**

v.

**MARION COUNTY OFFICE OF FAMILY AND CHILDREN and Child Advocates, Inc., Appellees (Plaintiff below).**

No. 49S02–0209–JV–00473.

Supreme Court of Indiana.

June 29, 2004.

---

Katherine A. Cornelius, Deputy Appellate Public Defender, Ann Sutton, Indianapolis, IN, Attorneys for Appellants.

Stephen A. Carter, Office of the Attorney General, Indianapolis, IN, DeDe Connor, Marion County Office of Family & Children, Sheridan, IN, Loretta Oleksy, Child Advocates, Inc., Indianapolis, IN, Attorneys for Appellees.

ON PETITION TO TRANSFER FROM THE INDIANA COURT OF APPEALS, NO. 49A02–0105–JV–299.

SHEPARD, Chief Justice.

Mother and Father lost parental rights during a termination proceeding. Their appeal centers on the claim that the trial court did not adequately inquire about their decision to go forward with representation by the same lawyer. They contend that without an adequate demonstration that they understood the consequences of joint representation their right to counsel was violated. They say this right should be judged not by the test of *Strickland v. Washington,* so often transplanted from criminal law to parental termination cases, but rather by a standard that would make it easier for parents who lose at trial to

gain a second one. We conclude otherwise, seeing the question as one of assuring due process in a setting that is dramatically different from criminal proceedings.

### Facts and Procedural History

On August 8, 1998, Sharon Baker ("Mother") prematurely delivered a baby girl whom we will call D.C. Mother used cocaine while pregnant, as late as days before delivery. D.C. was hospitalized for about three weeks due to medical concerns, then placed in an emergency shelter, and eventually in foster care. D.C. has never lived with Mother or her father Darryl Cole ("Father").

The Marion County Office of Family and Children ("OFC") filed a petition in August 1998 alleging that D.C. was a child in need of services. Mother and Father admitted in writing and in open court that this was so. The court ordered both parents to complete certain services, namely a substance abuse evaluation and a parenting assessment, in order to have D.C. returned to them. Because such services were ineffective or not completed at all, the court found that it was in D.C.'s best interests to remain outside of the home. The court then ordered Mother and Father into Parental Participation, a social services program obliging both parents to cooperate with various assessments and services.

OFC's assigned family case manager Diane Reach began working on D.C.'s case in August 1998. She explained the court-ordered services to both parents, and sent letters detailing what was required of them and whom to contact for appointments. Both parents participated in the parenting assessment but did not complete it. They received a list of six different agencies offering parenting classes, but as of the fall 1998 neither parent reported completing such classes.

Mother and Father did not maintain consistent visitation with D.C. even though Reach sent them bus tickets and the foster parents offered to meet Mother and Father halfway when they complained of transportation problems. At least two different visitation centers established unsupervised visitation. Still, visits by both parents continued to be inconsistent. Both Mother and Father had thirteen scheduled visits at one of the visiting centers but only appeared at four.

Mother was arrested and incarcerated in Tippecanoe County for cocaine possession, so she missed a scheduled court date in January 1999. Father also failed to appear. Mother then became an inmate at the Indiana's Women's State Prison, from which she regularly mailed letters to Reach and letters and cards to Reach for D.C. Originally, the OFC planned to reunite with Mother and Father, but eventually gave up and petitioned to terminate the rights of both parents in April 1999.

Mother remained in the Women's Prison from January through October 1999, where she had visits with D.C. and completed parenting classes. Upon her release from prison, however, Mother's visits with D.C. waned. In October, Reach made new referrals for Mother and Father for drug and alcohol evaluations and for supervised visits with D.C. Both parents failed to follow through on the new referrals.

During a drug and alcohol assessment in August 2000, Mother told addictions counselor Lance Brown that she had used marijuana, alcohol, and cocaine two to four times a week over the last four years. She also told Brown she was receiving medication for depression and for epileptic seizures, and that she suffered from a partial paralysis in her left hand as a result of a drive-by shooting. Brown recommended treatment for depression and for cocaine dependency at a mental health center. Brown testified that he would "have seri-

ous concerns with any child being in the custody of a not treated chemically dependent person." (R. at 18.) Father had been scheduled at least twice for similar assessments but did not show up.

During the termination proceeding, Reach testified based on both parents' instability, inconsistent visitations, and continued chemical addictions it would be harmful to D.C. to be returned to her parents. Father acknowledged not having a residence of his own. He said that he would enter a three-month in-patient treatment program for his alcoholism the week after the termination proceeding. Mother was incarcerated for probation violations during the termination proceedings. She had not been employed since 1996 when she was fired because of frequent tardiness. Her plan to secure income post-jail was to file for social security disability benefits based on her partially paralyzed left hand. Mother, who had seven children, had lost parental rights for all but D.C. She said she smoked $40 to $50 worth of cocaine two days before D.C. was born prematurely. She admitted that although she loved D.C., she could not be a good parent to D.C. until she received treatment. She said, "...my baby don't deserve to keep on waiting on me. But I don't want her to be with no one else." (R. at 137–38.)

The termination petition was before the court for most of 1999 and all of 2000. Several lawyers appeared for the parents, though the parents were frequently absent and one lawyer withdrew because he had no contact with Mother even after several attempts.

Attorney Thomas D. Strodtman first appeared in the case in September 2000. During the final hearing on January 18, 2001, Strodtman acknowledged that he

would represent both Mother and Father. He stated that both parties consented to his representing them both and that no conflict resulted because "[t]here's no situation here that we see where Mom or Dad would be blaming each other for the allegations that have been alleged by the Office of Family and Children." (R. at 4.) Mother and Father stated that each agreed to the joint representation.

The trial court terminated parental rights for Mother and Father on February 23, 2001. The Court of Appeals affirmed, holding that ineffective assistance of counsel in termination hearing should be resolved on the same basis as in criminal proceedings and that the joint representation did not pose a conflict of interest. *Baker v. Office of Family and Children,* 768 N.E.2d 1008 (Ind.Ct.App.2002). We granted transfer. Ind. Appellate Rule 58.

### Assistance of Counsel in Termination Proceeding.

■ As the Supreme Court has explained, the U.S. Constitution does not require the appointment of counsel in every parental termination proceeding. The constitutional assurance of due process calls for counsel where the trial court's assessment of such factors as the complexity of the proceeding and the capacity of the uncounseled parent indicates an appointment is necessary. *Lassiter v. Dep't of Social Services,* 452 U.S. 18, 27–32, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981).

Rather than incur the time and money to litigate eligibility for public counsel in each case, Indiana has chosen to provide counsel in termination proceedings to all parents who are indigent. Ind.Code Ann. §§ 31–32–4–1 and 31–32–2–5 (West 1998).[1] The Code does not provide for appointment of counsel to seek post-judgment or collateral relief.

1. Indiana Code Annotated §§ 31–32–2–5 and 31–32–4–1 entitle a parent to receive representative counsel. Section 31–32–4–1 provides in part:

Our Court of Appeals has said that the statutory right to counsel in termination cases carries the right to performance by counsel measured by the same test applicable to indigent defense in criminal cases. *J.T. v. Marion County OFC,* 740 N.E.2d 1261, 1265 (Ind.Ct.App.2000).[2] A substantial number of other jurisdictions have so held.[3] We conclude that transporting the structure of the criminal law, featuring as it does the opportunity for repeated reexamination of the original court judgment through ineffectiveness claims and post-conviction processes, has the potential for doing serious harm to children whose lives have by definition already been very difficult.

For one thing, experience in the criminal law with the present system of direct appeals, post-conviction proceedings, and habeas petitions demonstrates that with rare exception counsel perform capably and thus ensure accurate decisions. The correctness of such decisions is at the heart of the assurance that parties in termination cases will receive due process. *Lassiter,* 452 U.S. at 27, 101 S.Ct. 2153.

Second, criminal prosecutions and termination proceedings are substantially different in focus. The resolution of a civil juvenile proceeding focuses on the best interests of the child, not on guilt or innocence as in a criminal proceeding. As the Supreme Court said when it held that the writ of habeas corpus was not available for collateral attacks on state termination decisions, the parent "simply seeks to relitigate, through federal habeas, not any liberty interest of her sons, but the interest in her own parental rights." *Lehman v. Lycoming County Children's Servs. Agency,* 458 U.S. 502, 511, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).

Sec. 1. The following persons are entitled to be represented by counsel:
...
(2) A parent, in a proceeding to terminate the parent-child relationship, as provided by IC 31–32–2–5.
Indiana Code Annotated § 31–32–2–5 states, "[a] parent is entitled to representation by counsel in proceedings to terminate the parent-child relationship.
Indiana Code Annotated § 31–6–5–3(7) originally governed this entitlement. It said in relevant part that the trial court would inform the parents in involuntary termination of their right to be represented by counsel and their right to appointed counsel if necessary. (The statute was repealed in 1997, and this proposition is currently governed by Ind.Code Ann. § 31–32–4–1 (right to counsel) and Ind.Code Ann. § 31–32–4–3 (right to appointed counsel)).

2. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), established legal principles to govern ineffective assistance of counsel in criminal proceedings. It sets forth a two-part test where the petitioner must show that 1) counsel's actions fell below the range of reasonable performance, and 2) the error was prejudicial.

3. *See e.g. In re Stephen,* 401 Mass. 144, 514 N.E.2d 1087 (1987); *State ex. rel. V.M.R.,* 768 P.2d 1268 (Colo.Ct.App.1989); *In re Simon,* 171 Mich.App. 443, 431 N.W.2d 71 (1988); *Jones v. Lucas Cty. Chidren Svcs. Bd.,* 46 Ohio App.3d 85, 546 N.E.2d 471 (1988) (each applies the criminal IAC standard which examines whether the defendant was likely deprived of an otherwise available substantial defense.) Other jurisdictions have reached diverse decisions. *See State ex. rel. Juvenile Dept. of Multnomah County v. Geist,* 310 Or. 176, 796 P.2d 1193 (1990) (addresses whether the proceeding was fundamentally fair); *In re Interest of J.C., Jr.,* 781 S.W.2d 226 (Mo.Ct.App.1989) (whether the attorney was effective in providing his client with a meaningful hearing based on the record.); *In re Adoption of T.M.F.,* 392 Pa.Super. 598, 573 A.2d 1035, 1044 (1990) (fundamental fairness: "whether on the whole the parties received a fair hearing, the proof supports the decree by the standard of clear and convincing evidence, and upon review. Any failure of [counsel's] stewardship was the cause of a decree of termination."); *In re Moseley,* 34 Wash.App. 179, 660 P.2d 315 (1983) (whether it appears from the record that attorney was not effective in providing a meaningful hearing)

Third, serial relitigation in criminal cases imposes a substantial burden on victims and witnesses, typically adults. We justify imposing this burden on them by saying that the complete deprivation of personal liberty represented by incarceration demands a thorough search for the innocent. In the context of termination cases, extended litigation imposes that burden on the most vulnerable people whom the system and such cases seek to protect: the children. As Justice Powell wrote, "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." *Lehman,* 458 U.S. at 513–14, 102 S.Ct. 3231. Justice Joette Katz made a similar observation when Connecticut's high court decided not to permit state habeas as a vehicle for collateral attacks on judgments of termination: "[T]here exists, as the trial court noted in this case, a 'frightening possibility that a habeas petition will negate the permanent placement of a child whose status had presumably been in limbo for several years.' Consequently, the state's interest as paren patriae militates against allowing the writ." *In re Jonathan M.,* 255 Conn. 208, 764 A.2d 739, 753 (2001) (footnote omitted).

To permit the children to travel from one home to another while termination proceedings span across the years is "incongruous and contrary to the federal and state policy of minimizing the 'foster care drift' that has doomed millions of children to interim, multiple or otherwise impermanent placement." *In re Adoption of A.M.B.,* 812 A.2d 659, 667 (Pa.Super.Ct.2002). Due to the immeasurable

damage a child may suffer amidst the uncertainty that comes with such collateral attacks, it is in the child's best interest and overall well being to limit the potential for years of litigation and instability. "It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents. There is little that can be as detrimental to a child's sound development as uncertainty." *Lehman,* 458 U.S. at 513, 102 S.Ct. 3231.

The current system has already been criticized for putting children in limbo too long. This problem was sufficiently serious that Congress has legislated to curb "foster care drift"—the recurring travel of children from one place to another promoting instability and unhinged relationships.

During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as 'foster care drift' and resulted in the enactment by Congress of Public Law 96–272, the 'Adoption Assistance and Child Welfare Act of 1980,' codified at 42 U.S.C. §§ 610–679 (1988). One of the important (sic) purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

*In re Adoption/ Guardianship of Nos. J9610436 and J9711031,* 368 Md. 666, 796 A.2d 778, 783–84 (2002).[4] Among other

---

**4.** *See In re Priser,* No. 19861, 2004 WL 541124 at * 6 (Ohio Ct.App. March 19, 2004) ("Such provisions and the limitations placed upon the court's authority to place a child in long term foster care... are designed to insure that a child does not languish, forgotten, in

things, the federal act requires the state to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42 U.S.C. § 671(a)(16).[5] The court then has an essential responsibility to supervise an appropriate permanency plan intended to thwart foster care drift.

Fourth, the odds of an accurate determination in a termination case are enhanced by the fact of judicial involvement that is much more intensive than it is the usual criminal case. As Judge Tamila noted for the Superior Court of Pennsylvania:

> [B]ecause of the doctrine of Parens Patriae and the need to focus on the best interest of the child, the trial judge, who is the fact finder, is required to be an attentive and involved participant in the process. While he must depend upon the litigants to present the evidence to establish the particular elements or defenses in the termination case, he is not limited to their presentations, and as in any custody case, he may require more than they present and direct further investigation, evaluations or expert testimony to assure him that the interests of the child and the respective parties are properly represented. Under the aegis of the court, the role of the lawyer, while

important, does not carry the deleterious impact of ineffectiveness that may occur in criminal proceedings.
*In re Adoption of T.M.F.*, 392 Pa.Super. 598, 573 A.2d 1035, 1042–43 (1990).

American public policy holds that children are likely raised best by their parents. Parental termination is a last resort. Parents have numerous opportunities to rectify their situations before the parental termination hearing. A termination hearing results only when attempts to rectify the conditions that led to removal from the parents have failed over a prolonged period.

■■■ Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.[6]

---

5. The act requires:

> [T]he case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another permanent placement for the child. 42 U.S.C. § 675(1). The state must also implement a case review system that provides for administrative review of the case plan at least every six months and judicial review no later than eighteen months after the placement and periodically thereafter. 42 U.S.C. § 675(5)(B) and (C). The purpose of the judicial review is

custodial limbo for long periods of time without permanency.")

to 'determine the future status of the child' including whether the child should be returned to its biological parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster care on a long term basis. 42 U.S.C. § 675(5)(C).
*In re Adoption/ Guardianship Nos. J9610436 and J9711031*, 368 Md. 666, 796 A.2d 778, 784 (2002)

6. We adopted a similar approach to claims that post-conviction lawyers performed badly. Rejecting application of *Strickland v. Washington* to such claims, we held that if counsel in fact appeared and represented the petitioner in a procedurally fair setting which resulted in a judgment of the court, post-conviction

### The Instant Claim Fails

■ Applying the standard to the present case, we find that Mother and Father's claim is untenable. Their joint representation did not result in a conflict of interest, which might well produce a procedurally unfair setting. Mother and Father preserved the same interests, namely maintaining parental rights over D.C. As the Court of Appeals stated, there was no solid evidence showing that their interests were "adverse and hostile." 533 N.E.2d at 1200.

Strodtman appropriately questioned and cross-examined witnesses on behalf of both parents and he also cross-examined both Mother and Father when they were called to testify. (Appellee Br. at 7; T.R. at 19, 70, 138, 154, 163.) Strodtman's prediction that Mother and Father did not have adverse interests and were not presenting evidence against one another proved correct. At no time did they blame each other for the allegations made by the OFC. (Appellee Br. at 10.)

Moreover, the record does not suggest that either parent stood to gain significantly by separate representation. Both parents were individually and independently required to complete certain treatments and services to regain custody of D.C. Each of them was responsible for his or her own services and neither could gain from the other's participation or lack thereof. (Appellee Br. at 9.)

The record does support, alternatively, that both parents neglected to complete the treatments and services required of them after being afforded ample opportunities. In fact, both parents admitted that they could not be good parents to D.C. at that time. Father testified:

Q: . . . What have you done to prepare for [D.C.] coming to live with you?

A: I just told you. I am staying from here to there. I'm getting ready to go in-patient. Now I can't prepare her no place right now . . .

Q: So it's fair to say that you couldn't have [D.C.] returned to you right now, isn't that true?

A: She can still stay in foster care with my mother. But I can't have her returned to me right now."

(T.R. at 66.) Mother said: "I can't help nobody right now. I'm trying to help myself . . . I can't be that parent to [D.C.] right now until I get help for me." (T.R. at 132.)

There is nothing to suggest that representation by a single lawyer led to a fundamentally unfair hearing.

### Conclusion

We affirm the decision of the trial court.

DICKSON, BOEHM, and RUCKER, JJ., concur.

SULLIVAN, J., not participating.

relief is not warranted. *Baum v. State,* 533 N.E.2d 1200 (Ind.1989).