## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
May 31 2016, 8:31 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Abigail R. Recker
Attorneys General of Indiana
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:
B.B. *(Minor Child)*
    and
P.G. *(Mother)*,

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner.*

May 31, 2016

Court of Appeals Case No.
49A02-1508-JT-1076

Appeal from the Marion Superior Court

The Honorable Marilyn Moores, Judge

The Honorable Larry Bradley, Senior Magistrate

Trial Court Cause No.
49D09-1411-JT-473

**Robb, Judge.**

# Case Summary and Issue

P.G. ("Mother") appeals the juvenile court's order terminating her parental rights to her son, B.B. (born July 29, 2008). Mother raises the sole issue of whether the Indiana Department of Child Services ("DCS") violated her due process rights when it declined to refer additional reunification services after the juvenile court issued an order changing the permanency plan to adoption with a concurrent plan of reunification. Concluding a failure to provide services does not constitute a basis for directly attacking a termination order, we affirm.

# Facts and Procedural History

B.B. is a special needs child living with hemiplegia. The hemiplegia was caused by a brain injury B.B. sustained while in the care of his father; specifically, B.B.'s father shook B.B. when he was an infant.[1] The hemiplegia affects the left side of B.B.'s body, causing decreased strength and motor control and poor bilateral hand coordination. Consequently, B.B. has difficulty walking and struggles to complete activities of daily living. In February 2010, the juvenile court adjudicated B.B. a child in need of services ("CHINS") "due to his extensive and complicated medical needs." Appellant's Appendix at 18. The juvenile court later removed B.B. from Mother's care and placed him in foster care. In late 2011 or early 2012, while in the care of his foster family, B.B.

---

[1] The juvenile court's order also terminated Father's parental rights, but Father is not participating in this appeal.

started to attend physical therapy sessions. Although B.B. was by that time three and a half years old, his physical development was in the twelve- to fifteen-month range. Physical therapy, in conjunction with a brace, improved B.B.'s strength and ability to walk.

[3] B.B. was returned to Mother's care in April 2012, and the CHINS case was closed in May of that year. Although Mother did not have to pay for B.B.'s physical therapy, B.B. "missed most of his appointments" in the months to follow. Transcript at 31. B.B.'s physical therapist explained,

> I called every time, a day or two before the appointment to remind [Mother] about the appointment. I don't do that for every family that I work with, but I was doing it in this situation. Frequently, she either had a conflict or wasn't going to be able to make it, so I would offer to reschedule for the next week, so . . . we tried. I tried hard.

*Id.* at 31-32. Eventually, B.B.'s physical therapist confronted Mother about their attendance and asked Mother whether she wanted to continue physical therapy. Mother stated she did not want to continue. At that point, B.B. was almost four years old, but his skills were around an eighteen-month level.

[4] On December 14, 2012, DCS filed a second CHINS petition. The juvenile court held a detention hearing and removed B.B. from Mother's care. B.B. resumed physical therapy, but his condition had "deteriorated considerably." App. at 19. By January 2013, "[B.B.]'s left foot had turned down and in, requiring surgery. He could not stand or walk and his developmental age had

regressed to less than twelve months." *Id.* The position of his foot indicated B.B. had not been wearing his brace.

[5] The juvenile court adjudicated B.B. a CHINS on April 1, 2013, based on Mother's admission that she "has not provided [B.B.] with appropriate medical care." Exhibit Volume at 66. The juvenile court also entered a dispositional decree authorizing B.B.'s continued placement in foster care and approving a permanency plan for reunification. Thereafter, the juvenile court entered a parental participation order requiring Mother to participate in home-based counseling, participate in B.B.'s medical appointments, and meet all of B.B.'s medical needs in a timely and complete manner.

[6] At a review hearing on October 1, 2013—which Mother did not attend—the juvenile court found Mother was "minimally participating" in home-based counseling, did not allow service providers to enter her home, and failed to attend many of B.B.'s medical appointments. *Id.* at 82. Mother again failed to appear for a review hearing held on April 15, 2014, because she was serving a sentence in the Marion County Jail. The juvenile court ordered Mother to participate in services upon her release and scheduled a review hearing following her release date. She failed to appear at that hearing because she was

serving a different sentence in the Department of Correction for welfare fraud, with a release date of January 21, 2015.[2]

[7] On October 28, 2014, the juvenile court conducted a permanency hearing and found "Mother's participation prior to her incarceration was lacking and she did not show an ability to care for her special needs child." *Id.* at 107. DCS requested the permanency plan be changed from reunification to adoption. The juvenile court approved the change in part, modifying the permanency plan to "adoption with a concurrent plan of reunification." *Id.* A week later, DCS filed a petition to terminate Mother's parental rights.

[8] By January 2015, B.B. had made "very good progress" in physical therapy. Tr. at 38. He "[w]as walking well, starting to run, making progress in safety on stairs, getting in and out of vehicles, [and] playing on playground equipment." *Id.* B.B.'s physical therapist attributed his progress to his foster mother, who consistently attended physical therapy sessions, worked with B.B. on exercises at home, and accompanied B.B. during his other medical appointments. His physical therapist explained, "It's a team. [Caregivers] are just as important as the therapist. An integral part of therapy is teaching a parent what the needs of the child are, what, how they can work on exercises at home, how they can use

---

[2] Mother pleaded guilty to welfare fraud, a Class C felony, "for receiving [B.B.]'s Social Security payments after he had been removed from the home." App. at 19; *see also* Ex. Vol. at 123 (Plea Agreement, providing Mother will "make full restitution to the Social Security Administration in the amount of $12,438.00").

any sort of brace or adaptive equipment. . . . [I]f there's not carryover, progress is affected." *Id.* at 30.

[9] At a review hearing on February 10, 2015, Mother appeared and requested DCS re-refer services. DCS did not refer additional services—and the juvenile court did not order it to do so—because B.B. was transitioning into his pre-adoptive placement. The juvenile court set a permanency hearing for March 31, 2015, but for reasons unclear from the record, Mother failed to appear. During this hearing, B.B.'s case manager reported he was "doing very well" and "exceeding all expectations due primarily to the hard work of the pre-adoptive parents." Ex. Vol. at 116. DCS and the guardian ad litem recommended the permanency plan be adoption with no concurrent plan of reunification. The juvenile court agreed reunification was no longer in B.B.'s best interests and changed the plan to adoption only, noting "the length of time this matter has been open, the lack of progress by [Mother] and how Mother's current whereabouts are unknown[.]" *Id.*

[10] The juvenile court held an evidentiary hearing on the petition to terminate Mother's parental rights on July 13, 2015. In its termination order dated July 21, 2015, the juvenile court concluded,

> 33. [B.B.]'s placement is pre-adoptive. He has been observed as being bonded with his caregivers who have made major changes in their lives to provide the supervision and services [B.B.]'s special needs required.
> * * *
> 40. [B.B.] will soon be seven years of age and has spent fifty-one

months of his life placed outside the home and under the wardship of [DCS].

41. There is a reasonable probability that the conditions that resulted in [B.B.]'s removal and continued placement outside the home will not be remedied by his mother. [Mother] received services for two and one-half years under the first ChINS case regarding [B.B.]'s extensive and complicated medical needs. She failed to follow through with services and the current ChINS case was filed. [Mother] was inconsistent in attending therapy and medical appointments when given the opportunity prior to her being incarcerated for one year.
* * *
48. Continuation of the parent-child relationship poses a threat to [B.B.]'s well-being in that it would pose as a barrier to obtaining permanency for him, after a considerable time under wardship, through adoption. Returning [B.B.] to his mother, who has not shown she is able or willing to meet his extensive needs, would be detrimental to his future progress and well-being.

49. Termination of the parent-child relationship is in the best interests of [B.B.] Termination would allow him to be adopted into a safe and stable home that is totally committed to his well-being.

50. There exists a satisfactory plan for the future care and treatment of [B.B.], that being adoption.

App. at 19-20. This appeal followed.

# Discussion and Decision

The Fourteenth Amendment to the United States Constitution protects the right of parents to establish a home and raise their children. *In re G.Y.*, 904 N.E.2d

1257, 1259 (Ind. 2009). "We recognize, however, that parental interests are not absolute and must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights." *Id.* When a parent is unable or unwilling to meet her parental responsibilities, her parental rights may be terminated. *Id.* at 1259-60. "The purpose of terminating parental rights is not to punish parents, but to protect the children." *In re I.B.*, 933 N.E.2d 1264, 1270 (Ind. 2010) (citation omitted). "A termination hearing results only when attempts to rectify the conditions that led to removal from the parents have failed over a prolonged period." *Baker v. Marion Cnty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004).

[12]     A petition to terminate parental rights must allege:

> (A) that one (1) of the following is true:
> > (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.
>
> * * *
>
> (B) that one (1) of the following is true:
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
> (C) that termination is in the best interests of the child; and
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must prove each element by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d at 1261. If the juvenile court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[13] Mother does not specifically challenge any of the juvenile court's findings or conclusions but argues the order terminating her parental rights should be vacated because DCS violated her due process rights by declining to refer additional reunification services. Although Indiana Code section 31-34-21-5.5 requires DCS to "make reasonable efforts to preserve and reunify families" during CHINS proceedings, the provision of services "is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015) (citation omitted), *trans. denied*; *see also In re E.E.*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("[E]ven a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal."). Because a failure to provide services does not constitute a basis for directly attacking a termination order, Mother's argument fails.

## Conclusion

[14] It is well established that a failure to provide services cannot serve as a basis for challenging the termination of a parent-child relationship. Since Mother's only

argument on appeal rests on DCS's alleged failure to provide services, we must affirm the juvenile court's order terminating Mother's parental rights to B.B.

Affirmed.

Najam, J., and Crone, J., concur.