# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Nov 30 2017, 9:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Law Office of Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Robert J. Henke
Deputy Attorneys General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of K.J. and E.L. (Minor Children),

and

K.I.J. (Mother) and E.L.L. (Father)

*Appellant-Respondents,*

v.

Indiana Department of Child Services,

*Appellee-Petitioner.*

November 30, 2017

Court of Appeals Case No. 75A03-1706-JT-1321

Appeal from the Starke Circuit Court

The Honorable Kim E. Hall, Judge

Trial Court Cause Nos.
75C01-1701-JT-1
75C01-1701-JT-2

**Mathias, Judge.**

[1] K.I.J. ("Mother") and E.L.L. ("Father") (collectively "the Parents") challenge the order of the Starke Circuit Court terminating their parental rights to their minor children K.J. ("Daughter") and E.L. ("Son") (collectively "the Children"). On appeal, the Parents claim that the attorney appointed to represent them jointly at the termination hearing was ineffective due to a conflict of interest. Because the performance of Parents' counsel does not diminish our confidence that the trial court's termination decision was proper, we affirm.

## Facts and Procedural History

[2] Mother and Father are the parents of Daughter, born in April 2011, and Son, born in October 2013. On October 4, 2015, police called the local office of the Indiana Department of Child Services ("DCS") after they found Mother and Father passed out in a car parked in front of an auto parts store. Mother and Father appeared to be under the influence of some intoxicating substance, as they both had slurred and slowed speech and diminished mental capacity. The Children were in the back seat of the car. When they were examined, it was discovered that the Children were infested with lice and fleas. The Children had to undergo multiple treatments to remove the infestation. When the Children were taken by DCS, then four-year-old Daughter had no emotional reaction to leaving her parents and went willingly with the DCS caseworker, which is not a typical reaction for a child removed from her parents.

[3] As a result of this incident, Mother and Father were both arrested and charged with Level 6 Felony neglect of a dependent and Class B misdemeanor public intoxication. Father was additionally charged with Class A misdemeanor driving while suspended. Mother tested negative for drugs, but Father, who denied using drugs, tested positive for use of methadone, methamphetamine, and amphetamine. The trial court approved the continued detention from the Parents at a detention and initial hearing held October 7, 2015. The trial court also approved placement of the Children in foster care.

[4] On October 19, 2015, the Children were adjudicated to be children in need of services ("CHINS") by the admission of the Parents. The trial court entered a dispositional decree on November 17, 2015, which ordered the Parents to participate in services as follows: (1) complete an initial clinical assessment and follow all recommendations; (2) complete a substance abuse assessment and follow all recommendations; (3) complete a parenting assessment and follow all recommendations; (4) comply with all random drug and alcohol screens given by DCS and service providers; (5) cooperate with home-based case management services and homemaker services as arranged by DCS; (6) obtain and maintain appropriate housing; (7) obtain and maintain employment or a means of financial support for the children; (8) cooperate with DCS and maintain contact with updated information or changes; and (9) complete a psychological assessment and follow any recommendations from the assessment. Ex. Vol. p. 12.

*A. Father*

Father did not complete any of the ordered services, nor did he ever visit the Children due to his frequent incarceration and his inability to produce clean drug screens. Also, Father never contacted the DCS family case manager to set up any visitation with the Children.

When Father was released from jail on December 2, 2015, he was rearrested and charged with public intoxication just two days later. He was ultimately convicted on this charge and sentenced to four months in jail. Father then pleaded guilty to the charges of neglect and driving while suspended on May 4, 2016, and was sentenced to an aggregate sentence of two years to be served in the community corrections work release program. While in jail, Father began to work with Jerome Kelly ("Kelly"), a case worker from Family Focus, on "father engagement services." Kelly attempted to work with Father on developing a twelve-week parenting program and also planning for housing, employment, and substance abuse therapy after his release. After he was transferred to the community corrections work release program, however, Father did not contact Kelly and there was a lapse in Father's participation in services.

After Father was placed in community corrections, he often appeared to be under the influence of illicit drugs. Indeed, his first job in the work release program was terminated after approximately one month due to his substance abuse; his second job lasted only approximately two weeks before he was again terminated because he appeared to be under the influence at work. A drug

screen Father took around this time, mid-July 2016, tested positive for synthetic marijuana. On August 3, 2016, Father was found to have violated the terms of his placement in work release and sent back to jail. He was released on October 4, 2016.

[8]     A meeting was held later that month with the Parents, DCS, the service providers, and the children's court-appointed special advocate ("CASA"). At this meeting, Father indicated that he understood that he needed to comply with the case plan, which he had not been doing. But Father insisted upon "getting his own treatment and . . . completing the services on his own and not through DCS." Tr. p. 43. He was not cooperative and eventually "stormed out" of the meeting. *Id.* at 45. Thereafter, Father did not participate in services and did not respond to attempts to contact him. Thus, the DCS family case manager had no contact with Father until the January 17, 2017 permanency hearing. And at that time, Father tested positive for marijuana and Suboxone,[1] a controlled substance for which he did not have a prescription; instead, he obtained the drug from a friend. Father admitted to the DCS case manager that he was unable to stay sober or even take steps toward sobriety.

[9]     At the termination hearing, Father testified that he was employed full time at a factory and living with his sister and her two young children. He further testified that he was close to completing a substance abuse treatment he had

---

[1] Suboxone is a trade name for a compound containing the opiate drug buprenorphine and naloxone, used to treat opioid overdoses. *See* Buprenorphine/Naloxone, PubMed Health, U.S. National Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0023949/?report=details(published Nov. 1, 2017).

started at the beginning of the year and that he had tested negative for drug use. But Father had no explanation for why he had not informed DCS of his claimed progress in dealing with his substance abuse problem.

*B. Mother*

As a result of the neglect charges, Mother was in jail from the beginning of October 2015 until the end of April 2016. She was then sent to Life House, a facility for seriously mentally ill adults in Valparaiso, Indiana, where she still remained at the time of the termination hearing.

Mother completed a psychological evaluation in July 2016, during which she reported that she had a history of substance abuse that started at the age of fourteen with the use of marijuana and then continued to include alcohol, cocaine, and heroin. She also admitted that, in the six months prior to DCS's involvement, she was using methamphetamine. Mother also reported a history of mental illness, including bipolar disorder and schizophrenia. She had been hospitalized three or four times for manic episodes and suicidal behavior. While in jail, Mother attempted suicide by cutting her wrists. Mother also reported that she was legally married to a man other than Father, and that there had been one incident of domestic violence involving Father.

Dr. LeRoy Burgess ("Dr. Burgess"), conducted a psychological parenting evaluation of Mother. The tests given as part of this evaluation revealed that Mother's intelligence was in the lower end of average; although she likely had a learning disorder, her scores did not indicate an intellectual disability. The

testing also confirmed that Mother has symptoms consistent with bipolar disorder and personality traits including negativistic thinking, borderline personality characteristics, and paranoia in addition to "the significant presence of anxiety, mania, post-traumatic stress, perceptual disturbances, and major depression that has likely developed and is exacerbated by [Mother]'s personality characteristics." Ex. Vol. p. 80. The tests further indicated that there was a significant probability that Mother had moderate to severe substance abuse disorder.

[13] Mother was also given the Child Abuse Potential Inventory test, which is administered in an effort to assist in the determination of risk for future child abuse. Mother's responses resulted in a "significantly elevated abuse score (=326)" which "indicates that she shares similar characteristics with physical child abusers, and that she is at greater risk to physically abuse her children than other parents." *Id*. at 82. Mother's results indicated "the need of immediate and continued intervention in order to better manage any potential risk of maladaptive parenting and interpersonal functioning." *Id*. at 83.

[14] Dr. Burgess diagnosed Mother with generalized anxiety disorder, schizoaffective disorder ("Bipolar Type, Moderate"), and severe alcohol use disorder. *Id*. at 80. Dr. Burgess also provided several recommendations before Mother was reunited with the Children, including: complete abstinence from substance use; continued medical treatment; individual psychological therapy; participation in parenting classes; supervised visitation with the Children; and securing gainful employment when recommended by her therapist. *Id*. at 80–84.

[15] The DCS family case manager worked with Mother when she was at Life House, where Mother completed two parenting programs. However, Mother was unable to apply what she was taught to her interaction with the Children. During her visits with the Children, Mother had to be prompted to do basic parenting, such as holding a child's hand when getting out of a car, taking them to the restroom, and washing the child's hands after using the restroom. Mother lacked attentiveness and had trouble keeping focused on the Children. Mother also showed anger issues. When she forgot to ask then two-year-old Son if he had to use the bathroom, the child understandably had an accident. This happened on two or three occasions, causing Mother to curse at the toddler.

[16] When the visits started after Mother's release from jail, the Children did not recognize Mother. Before the visits began, the Children's therapist showed a photo of Mother to Daughter, who denied that the person in the photo was her mother. When showed the photo again, Daughter stated that she did not want to talk about Mother. The therapist testified that the Children's reaction indicated that their bond with Mother had been "very weak, or severed, or non-existent." Tr. p. 123. As the visits continued, Daughter recognized who Mother was, and, initially at least, was affectionate towards her. But the bond dissipated as the visits continued. In December 2016, Daughter did not want the visits to continue and wanted them to end early. On January 17, 2017, Daughter scratched herself on the face and neck during her visit with Mother because she was so distraught. She scratched herself in an attempt to end the visit early. Thereafter, the trial court suspended the visitations. Son too

appeared to have little bond with Mother. He cried when removed from his car seat to go to visits, and he sought comfort from the visitation coordinator rather than Mother.

[17] Mother also had trouble obtaining and maintaining employment. Mother testified that she had applied for over sixty jobs, but she had one job during the CHINS proceedings at a fast food restaurant, and this lasted only one day because she was unable to use the computer system. Mother testified that she had previously been employed by other restaurants and one factory, but these jobs lasted only a few months due to her mental health issues.

[18] Mother told her case manager that she planned on living with her own mother ("Grandmother"). But Grandmother already had custody of three of Mother's other teenaged children. Mother told her case manager that the children were with Grandmother because she could not afford to care for them, but she reported in her psychological evaluation that the reason for their placement with Grandmother was Mother's previous suicide attempt. Moreover, Grandmother informed Mother that she could not stay with her. Mother did not have a driver's license or any means of transportation. She stated that she was applying for social security benefits and hoped to get an apartment on her own.

*C. The Children*

[19] After being removed from the Parents' care, the Children were placed in the same foster home. The children began therapy with goals of adjusting to their

new placement and addressing any symptoms of trauma. The Children adjusted quickly and very well to their foster family and consider their foster family to be their family.

*D. Termination Proceedings*

[20] As a result of the Parents' failure to show adequate progress, the DCS filed a petition to terminate the Parent's parental rights on January 17, 2017. The trial court held a fact-finding hearing on the petition on March 22, 2017. At the hearing both Mother and Father were represented by the same counsel, who had been appointed during the CHINS proceedings. On March 31, 2017, the trial court entered two orders, one for each child, containing findings of fact and conclusions of law and terminating the Parent's rights to the Children. The Parents now appeal.

# I. Termination of Parental Rights

[21] We have often noted that the purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for the termination of such rights when the parents are unable or unwilling to meet their responsibilities as parents. *Id*. Indeed, the parents' interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d 1257, 1259 (Ind. 2009).

[22] The termination of parental rights is controlled by Indiana Code section 31-35-2-4(b)(2), which provides that a petition to terminate parental rights must allege:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

[23] The burden is on DCS to prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *G.Y.*, 904 N.E.2d at 1261. As Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is required to find that only one prong of that subsection has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010).

[24] If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. I.C. § 31-35-2-8(a). If the court does not find that the allegations in the petition are true, it shall dismiss the petition. *Id.* at § 8(b). Indiana Code section 31-35-2-8(c) provides that the trial court "shall enter findings of fact that support the entry of the conclusions required by subsections

(a) and (b)" to either terminate a parent-child relationship or to dismiss the termination petition. *See* Ind. Code § 31-35-2-8(c).

## II. Assistance of Counsel in Termination Cases

The Parents claim that they were denied the effective assistance of trial counsel at the termination hearing. Our supreme court has noted that the United States Supreme Court has held that the federal Constitution "does not require the appointment of counsel in every parental termination proceeding." *Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1038 (Ind. 2004) (citing *Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 31–32 (1981)). Instead, "[t]he constitutional assurance of due process calls for counsel where the trial court's assessment of such factors as the complexity of the proceeding and the capacity of the uncounseled parent indicates an appointment is necessary." *Id.* (citing *Lassiter*, 452 U.S. at 31–32).

Indiana has chosen to provide counsel to indigent parents in termination proceedings, rather than "incur the time and money to litigate eligibility for public counsel in each case." *Id.*; *see also* Ind. Code § 31-32-4-1 ("The following persons are entitled to be represented by counsel . . . (2) A parent, in a proceeding to terminate the parent-child relationship, as provided by IC 31-32-2-5"); Ind. Code § 31-32-2-5 ("A parent is entitled to representation by counsel in proceedings to terminate the parent-child relationship."). This right to

counsel includes the right to counsel on appeal. *In re Termination of Parent-Child Relationship of I.B.*, 933 N.E.2d 1264, 1268 (Ind. 2010).[2]

[27] Earlier opinions from this court had measured counsel's performance using the two-part *Strickland* test applicable in criminal cases. *Baker*, 810 N.E.2d at 1039 (citing *J.T. v. Marion Cty. Office of Family and Children*, 740 N.E.2d 1261, 1265 (Ind. Ct. App. 2000)). The *Baker* court, however, held that the *Strickland* standard was inappropriate to evaluate claims of ineffective assistance of counsel in termination proceedings.[3] *Id.* Instead, the *Baker* court set forth the following test to judge counsel's effectiveness in termination proceedings:

---

[2] The statutory right to counsel in termination proceedings does not include the right to counsel when seeking post-judgment or collateral relief. *In re I.B.*, 933 N.E.2d at 1267 n.2 (citing *Baker*, 810 N.E.2d at 1038).

[3] The *Baker* court gave several reasons for its rejection of the use of the *Strickland* test in termination cases:

> [First], experience in the criminal law with the present system of direct appeals, post-conviction proceedings, and habeas petitions demonstrates that with rare exception counsel perform capably and thus ensure accurate decisions. The correctness of such decisions is at the heart of the assurance that parties in termination cases will receive due process. Second, criminal prosecutions and termination proceedings are substantially different in focus. The resolution of a civil juvenile proceeding focuses on the best interests of the child, not on guilt or innocence as in a criminal proceeding.
>
> * * *
>
> Third, serial relitigation in criminal cases imposes a substantial burden on victims and witnesses, typically adults. In the context of termination cases, extended litigation imposes that burden on the most vulnerable people whom the system and such cases seek to protect: the children. . . . Due to the immeasurable damage a child may suffer amidst the uncertainty that comes with such collateral attacks, it is in the child's best interest and overall well being to limit the potential for years of litigation and instability.
>
> * * *
>
> Fourth, the odds of an accurate determination in a termination case are enhanced by the fact of judicial involvement that is much more intensive than it is [in] the usual criminal case.

*Id.* at 1039–41 (citations omitted). The *Baker* court further noted that termination of parental rights is a last resort. *Id.* at 1041. "Parents have numerous opportunities to rectify their situations before the parental termination hearing. A termination hearing results only when attempts to rectify the conditions that led to removal from the parents have failed over a prolonged period." *Id.*

Where parents whose rights were terminated [at] trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Id.* at 1041.

[28] Thus, in addressing the Parent's claim of ineffective assistance, we do not focus on the particular actions of the Parent's counsel, i.e. "whether he objected to this or that[.]" *Id.* Instead, we will consider whether counsel's performance was so defective as to undermine our confidence in the trial court's termination decision. *See In re A.P.*, 882 N.E.2d 799, 806 (Ind. Ct. App. 2008) (holding that termination counsel did not provide ineffective assistance where parent received a fundamentally fair trial where the facts demonstrated an accurate determination and court could say with confidence that DCS adequately proved its case); *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 376 (Ind. Ct. App. 2007) (holding that parent's counsel provided effective assistance where court's confidence that trial court's order was supported by sufficient evidence had not been undermined), *trans. denied.*

## III. Parents' Counsel Was Not Ineffective

The Parents claim that their trial counsel was ineffective because he represented them jointly at the termination hearing. A similar argument was before the court in *Baker*, where both parents were represented by the same counsel at the termination hearing.

In *Baker*, the court recognized that a conflict of interest "might well produce a procedurally unfair setting," but held that the parents' counsel's joint representation did not result in a conflict of interest. *Baker*, 810 N.E.2d at 1042. The court noted that both parents had the same interests, i.e. preserving their parental rights, and there was no "solid evidence" that their interest were adverse and hostile. *Id*. The parents' counsel cross-examined witnesses and cross-examined the parents. *Id*. And neither parent blamed the other for the allegations made by the State. *Id*. Nor was there any indication that either parent stood to gain significantly by separate representation, as both parents were "individually and independently required to complete certain treatments and services to regain custody of [their child]," and "[e]ach of them was responsible for his or her own services and neither could gain from the other's participation or lack thereof." *Id*. Moreover, both parents neglected to complete the services and treatment required of them after being afforded ample time to do so, and both admitted that they were unable to parent their child at the time of the termination hearing. *Id*. Therefore, the *Baker* court held that "[t]here is nothing to suggest that representation by a single lawyer led to a fundamentally unfair hearing." *Id*.

[31]　Here, the Parents argue that the present case is sufficiently different from the facts in *Baker* to show that there was a conflict of interest sufficient to produce a procedurally unfair setting. Specifically, they argue that there was a "high likelihood" of a conflict of interest between Mother and Father that precluded their counsel from being effective. Appellant's Br. at 11. In support of this argument, the Parents rely on two portions of testimony.

[32]　The first testimony was from the family case manager, who testified that Father told him that he had to "step up" as a parent because Mother could not parent. Tr. p. 39. The second was from Kelly, the "fatherhood engagement worker," who testified that he and Father had a conversation about how Father "really needed to step up because—or make a decision to where the children may need to go because mom is not capable of doin[g] this by herself." Tr. p. 66. The Parents now argue that, had their trial counsel not represented both of them, his strategy may have been different and he would have attacked these witnesses' testimony through cross-examination.

[33]　Neither of these statements indicates that the Parents had a conflict of interest. The testimony by the family case manager simply reflects that Father understood that he needed to accept his role as a parent; and the testimony by the engagement worker does not even attribute the statement about Mother's parenting abilities to Father.

[34]　Even if these statements did establish that "Father did not have a high regard for Mother's ability to effectively parent the children," Appellant's Br. at 11, the

trial court's findings and conclusions contain no indication that the trial court, when making its termination decision, relied upon Father's apparent agreement with DCS with regard to Mother's parenting abilities. In other words, there is nothing to indicate that the trial court's decision was based upon Father's assessment of Mother's parenting skills. We therefore fail to see how further cross-examination of these witnesses would have affected the trial court's determination.

[35] Furthermore, as in *Baker*, both Parents had the same interests—preserving their parental rights to the Children. Both Parents were separately required to complete certain treatment and services and each was responsible for his or her own participation in services. Thus, neither could gain from the other's participation or lack thereof. *See Baker*, 810 N.E.2d at 1042. Father failed to complete services and Mother gained little from her participation in services, despite having been given ample time to participate and learn from the services. Accordingly, we discern nothing that would indicate that the performance of Parents' counsel was so defective that we cannot say with confidence that the conditions leading to the removal of the Children from parental care are unlikely to be remedied and that termination is in the Children's best interest. To the contrary, as discussed below, the evidence before the court overwhelmingly supported the trial court's determination.

## IV. Sufficient Evidence to Support Termination

[36] There was ample evidence before the trial court to support the decision to terminate the Parents' rights to the Children.[4] The conditions that led to the removal of the Children were the Parents' drug use and neglect of the Children. Despite being offered services, Father never completed drug treatment and instead repeatedly tested positive for drugs and even appeared to be under the influence when he was in community corrections. Father lost his job due to being under the influence at work. After being placed back in jail and then released, Father insisted on getting his own treatment, but Father later admitted that he could not stay sober. And even at the termination hearing, Father provided no corroboration to his claim of participating in a drug treatment program. Perhaps more telling is that Father never visited the Children during the CHINS proceedings, nor did he ever contact DCS to attempt to set up visitation. From this evidence, the trial court properly concluded that there was a reasonable probability that the conditions that led to the Children's placement outside the Parents' home, or the reason for continued placement outside the Parents' home, would not be remedied.

---

[4] The Parents do not directly challenge any of the trial court's findings of fact or conclusions of law. Thus, to the extent that they argue that the trial court's findings or conclusions are clearly erroneous, they have waived this issue by failing to make a cogent argument, *Runkel v. Miami Cty. Dep't of Child Servs.*, 875 N.E.2d 369, 373 (Ind. Ct. App. 2007), *trans. denied* (citing Ind. Appellate Rule 46(A)(8)(a)), and we accept the trial court's findings as true. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (accepting as true factual findings that were unchallenged by father); *see also See T.B. v. Indiana Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012) (when unchallenged findings support termination, there is no error), *trans. denied.*

[37]  The same is true for the trial court's decision regarding Mother's parental rights. Although there was evidence that Mother has also abused drugs and alcohol, her main problem was her serious mental illness, including bipolar disorder and schizophrenia, which has led to suicide attempts and hospitalization. Mother was unable to apply the skills that were taught to her through the service providers, and she scored disturbingly high on a test designed to detect the risk of future child abuse. Mother did not interact properly with the Children during visit with them, even cursing at the youngest child when he had a toilet-training accident. The Children had a weak to nonexistent bond with Mother and the visits with Mother caused emotional trauma to both. Mother was unable to maintain employment and had no plans for stable housing once she was released from a residential treatment facility. Given these facts and circumstances, the trial court could readily conclude that there was a reasonable probability that the conditions that led to the Children's placement outside the Parents' home, or the reason for continued placement outside the Parents' home, would not be remedied.

[38]  There was also sufficient evidence to support the trial court's conclusion that termination was in the best interests of the Children. In addition to the Parents' lack of progress in rectifying their drug abuse and/or mental health issues, both Children showed little bond to their Parents. Indeed, Daughter did not even react when taken from the Parents' care. And neither child showed any attachment to Mother during visits. Daughter even harmed herself during a visit with Mother in an attempt to end the visit early. Father never visited the

Children after their removal. In foster care, the Children adjusted quickly and were doing well. They consider their foster parents to be their family, and Son has known no other family. The trial court's conclusion that termination of the Parents' rights was in the best interests of the Children was not clearly erroneous.

## Conclusion

[39] In this case, trial counsel's joint representation of Parents was only a potential, not an actual, conflict of interest. There was ample, independent, clear and convincing evidence to support the trial court's decision to terminate both Mother's and Father's parental rights to the Children. Accordingly, we affirm the judgment of the trial court terminating Mother and Father's parental rights to the Children.

[40] Affirmed.

Vaidik, C.J., and Crone, J., concur.