## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 27 2018, 6:01 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Gregory L. Fumarolo
Fort Wayne, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of D.K.R. (Child) and D.W.R. (Father);

D.W.R. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

September 27, 2018

Court of Appeals Case No. 18A-JT-613

Appeal from the Allen Superior Court

The Honorable Charles F. Pratt, Judge

Trial Court Cause No. 02D08-1705-JT-104

**May, Judge.**

[1] D.W.R. ("Father") appeals the involuntary termination of his parental rights to D.K.R. ("Child"). Father argues the Department of Child Services ("DCS") did not present sufficient evidence to prove the elements required to terminate his parental rights to Child because he was not given an opportunity to engage in services prior to termination. As Father's argument is better framed as one challenging due process, we will consider whether he was denied due process during the proceedings. Concluding Father received due process, we affirm.

## Facts and Procedural History

[2] Child was born to P.R. ("Mother")[1] on March 24, 2011. Mother and Father[2] were not married. Mother testified Father was not present at Child's birth, but he visited Child "periodically" after she came home from the hospital. (Tr. Vol. II at 43.) When Child was one and a half years old, Mother moved to Fort Wayne, Indiana, and Child stayed with Father in Chicago for three to four months while Mother "settled in." (Tr. Vol. II at 43.) Mother testified Father had provided approximately $400-$500 in child support during Child's lifetime and he had not seen Child for "three (3) to four (4) years." (*Id.* at 45.)

[3] On September 29, 2014, Child and her four siblings[3] were removed from Mother's care because Mother "left [Child] unattended and had been arrested

---

[1] Mother's rights to Child were also involuntarily terminated, but she does not participate in this appeal.

[2] Father allegedly established paternity in Illinois, but that document is not in the record before us.

[3] Mother's parental rights to Child's siblings were also terminated, but they are not the subject of this appeal.

and convicted of resisting law enforcement, criminal recklessness, reckless driving and operating a vehicle without a license." (App. Vol. II at 10.) On October 1, 2014, DCS filed a petition to adjudicate Child and her siblings as Children in Need of Services ("CHINS"). Mother provided DCS with Father's last known address, and the certificate of service for the petition indicates DCS sent a copy of the petition to him.

[4] On October 24, 2014, DCS filed an amended petition to adjudicate Child a CHINS. Father's address was listed as unknown on that petition. On October 27, 2014, Child and her siblings were adjudicated CHINS after Mother admitted the allegations contained in the CHINS petition. The trial court entered a dispositional decree as to Mother the same day, ordering her to participate in certain services and visit with Child and her siblings. Father did not appear before the court at these proceedings.

[5] On June 1, 2017, DCS filed a petition to terminate the parental rights of Mother and Father to Child. DCS sent a copy of the petition to Father's last known address. Father's sister contacted DCS in August 2017, and Father spoke with the DCS Family Case Manager at that time. The trial court held a dispositional hearing as to Father in the CHINS case for the Child on September 20, 2017, but the court did not issue a dispositional order at that time. DCS began the process to arrange therapeutic visits between Father and Child, and Child completed the intake appointment on October 26, 2017, but Father did not complete the required intake appointment.

On November 6 and 7, 2017, the trial court held fact-finding hearings for the petition to terminate Mother's and Father's parental rights. Father was present at these hearings, and his counsel cross-examined witnesses, but Father did not testify. On February 7, 2018, the trial court entered an order terminating Mother's and Father's parental rights to Child based on Mother's lack of compliance with services and visitation, as well as the fact that Father "[had] not visited or provided for [Child]." (*Id*. at 13.)

# Discussion and Decision

Father challenges the involuntary termination of his parental rights on the basis that there existed insufficient evidence from which the trial court could conclude termination was appropriate pursuant to the requirements set forth in Ind. Code § 31-35-2-4(b)(2).[4] However, his arguments center around his

---

[4] To terminate a parent-child relationship, the State must allege and prove:

>  (B) that one (1) of the following is true:

>>  (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

>>  (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

>>  (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

>  (C) that termination is in the best interests of the child; and

>  (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

contention he did not receive certain due process throughout the proceedings, and we will address them as such.

[8] When the State seeks to involuntarily terminate a parent's right to his child, it must do so in a manner that meets the requirements of due process. *Hite v. Vanderburg Cty. Office of Family & Children*, 845 N.E.2d 175, 181 (Ind. Ct. App. 2006). "Due process in parental rights cases involves the balancing of three factors: (1) the private interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing government interest supporting use of the challenged procedure." *Id.*

[9] Here, Father's private interest in maintaining a relationship with Child is substantial insomuch as his parental rights have been terminated. *See J.T. v. Marion Cty. Office of Family & Children*, 740 N.E.2d 1261, 1264 (Ind. Ct. App. 2000) ("a parent's interest in the care, custody, and control of his child is 'perhaps the oldest of the fundamental liberty interests'") (*quoting Troxel v. Granville*, 530 U.S. 57, 65 (2000)), *reh'g denied, trans. denied, abrogated on other grounds by Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1041 (Ind. 2004) (abrogated regarding sufficiency of counsel). However, the State of Indiana also has a compelling interest in protecting the welfare of children. *In the Matter of E.M.*, 581 N.E.2d 948, 952 (Ind. Ct. App. 1991), *trans. denied*. Thus, we must consider the risk of error in the chosen procedure.

[10] Here, Father was identified by name as alleged father of Child in the September 30, 2014, petition to adjudicate Child as a CHINS. His date of birth and

address were also listed on the petition. (Ex. Vol. II at 60.)[5] The petition indicates it was served on Father. (*Id*. at 63.) The certificate of service on the trial court's Preliminary Inquiry Order, entered on October 1, 2014, indicated Father was served with that order. (*Id*. at 67.) The certificate of service for the order on initial hearing and detention order, entered on October 1, 2014, indicated Father was served with that order. (*Id*. at 76.) However, the certificate of service for the amended petition to adjudicate Child a CHINS, filed on October 24, 2014, indicates Father's address was unknown. (*Id*. at 84.)

[11]  On May 30, 2017, DCS filed its verified petition for involuntary termination of the parent-child relationship between Father and Child. In that petition, DCS listed Father's address, which was a different address than was provided for Father in 2014. (*Id*. at 13.) On September 27, 2017, the publisher of The Chicago Crusader signed an affidavit that she had published legal notice of the termination proceedings in The Chicago Crusader on September 9, 16, and 23, 2017. (*Id*. at 18.) On October 5, 2017, an employee of Evolution Process Service filed an Affidavit of Service indicating he had served the notice of the termination of parental rights proceedings to "Mona Parker" at the address provided for Father, and "Mona Parker" verified Father resided at that address. (*Id*. at 6.)

---

[5] The pages of the Exhibit Volume are not numbered, so we identify the page based on the page indicated by the electronic version of the record.

[12] Father appeared at a dispositional hearing on September 20, 2017, and the trial court indicated it would enter a dispositional order as to Father as part of the CHINS proceedings. Shortly following the dispositional hearing, DCS requested therapeutic visits be held between Father and Child, and Child was brought for the initial intake for those visits on October 26, 2017. Father did not complete an assessment prior to the termination hearing on November 6, 2017. Father attended the termination hearings on November 6 and 7, 2017.

[13] At the hearing, Mother testified she spoke with Father "every other week" and affirmed that throughout the proceedings they had been communicating at least monthly. (Tr. Vol. II at 49.) Mother testified Father "ask[ed] about [Child] all the time." (*Id*. at 52.) Mother affirmed she had told Father that Child was no longer in her care, and they "talked over the years about it and how to get [Child] back and everything." (*Id*. at 53.) Mother indicated Father knew Child had been removed from her care by Child's birthday in March 2015. While Father attended the hearing and his counsel cross-examined witnesses, Father did not testify.

[14] The record simply does not demonstrate that Father was denied the opportunity to participate in the proceedings. The record indicates DCS contacted Father at the address given for him as long as an address was provided, and Father did not testify that he did not receive notice of the CHINS proceedings. Mother testified Father knew Child was no longer in her care since at least 2015, but Father did not contact the court to appear in the CHINS proceedings at that point. Thus, we conclude the risk of error is not substantial because Father was

given the opportunity to participate in the latter portions of the CHINS action and in the termination proceedings, and Father has not demonstrated he failed to receive service of those items sent to him at the initiation of the proceedings. *See Hite*, 845 N.E.2d at 184 (risk of error not substantial because father was not denied the opportunity to be heard in the latter portions of the CHINS action and during the termination proceedings). Father cannot ignore notice of CHINS proceedings and then attempt to prolong the process by suddenly appearing after DCS files a termination petition almost three years after Child was removed from Mother's care. *See In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014) (permanency is a paramount need for children, and "children cannot wait indefinitely for their parents to work toward preservation or reunification").

# Conclusion

[15] Father's due process rights were not violated as part of the CHINS or termination of parental rights processes. Accordingly, we affirm the trial court's involuntary termination of Father's parental rights to Child.

[16] Affirmed.

Baker, J., and Robb, J., concur.