# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 14 2018, 9:41 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT R.B., SR.

Deidre L. Monroe
Public Defender's Office
Crown Point, Indiana

ATTORNEY FOR APPELLANT C.B.

Teresa K. Hollandsworth
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Involuntary Termination of the Parent-Child Relationship of R.B. and D.S. (Minor Children), and | March 14, 2018 |
| | Court of Appeals Case No. 45A03-1708-JT-1911 |
| R.B., Sr. (Father), A.S. (Father),[1] and C.B. (Mother), | Appeal from the Lake Superior Court |
| *Appellants-Respondents,* | The Honorable Thomas P. Stefaniak, Jr., Judge |
| v. | Trial Court Cause Nos. 45D06-1604-JT-101, -102 |
| The Indiana Department of | |

---

[1] A.S., the biological father of D.S., does not participate in this appeal. We nonetheless include him in the case caption because a party of record in the trial court shall be a party on appeal. Ind. Appellate Rule 17(A).

Child Services,

*Appellee-Petitioner*

**Crone, Judge.**

# Case Summary

C.B. ("Mother") appeals the trial court's order involuntarily terminating her parental rights to her minor children R.B. and D.S. (collectively "the Children"). R.B., Sr. ("Father"), appeals the trial court's order involuntarily terminating his parental rights as to R.B. [2] We affirm.

# Facts and Procedural History

Petitions to terminate parental rights were filed on April 4, 2016, and following a termination hearing held on May 24 and June 14, 2017, the trial court found the following relevant facts:[3]

> On or about June 24, 2009, the Department of Child Services [("DCS")] received a referral that police had found the home to be in a deplorable condition. Mother and Father, father of R.B., resided with the children in the home. The home was in total disarray with bags of clothing that were piled along the living room walls. Roaches were crawling around on the living room

---

[2] Father is the biological father of R.B. and stepfather to D.S.

[3] The trial court refers to the parties by their full names. We use "Father," "Mother," and the minor children's initials where appropriate.

floor and walls. The kitchen sink was filled with dirty dishes, as well as the kitchen countertops. Gnats and flies were flying around the kitchen. Several bags filled with garbage were piled up in the kitchen. An old foul-smelling mop bucket with standing water in it was located in the middle of the kitchen floor, and, cleaning supplies were next to food items on the kitchen counter. The bathroom had a foul stench and urine remained unflushed in the toilet. The children's beds had mattresses with extremely dirty bed linens that smelled of urine. Piles of clothing were also observed in the children's bedrooms. The parents' bedroom was also cluttered and had bags of unidentified objects within it. Old food items were on the bedroom dressers in the parents' room. The infant's bassinet was filled with various items including water bottles, food items, and other debris. The home smelled of cat urine and feces.

….

On or about June 7, 2009, the case manager went to the home and found that the family had moved without leaving a forwarding address. A few days later the case manager was able to locate [M]other on her cell phone and mother advised that the family had moved. The case manager conducted a home visit and found the home conditions to be better than the previous residence, however the housekeeping standards were approximately the same. None of the children had beds. The basement smelled of mildew and was cold and damp. The children's mattresses were located on the concrete floor of the basement. Bags of clothing were piled in the basement. At the time of the DCS'[s] intervention, the children were allowed to remain in the parents' home with the recommendation of intensive home based services. There were a total of five children in the home at the time.

….

Mother was given the opportunity to participate in services to remedy the home conditions. Intensive home based services were placed in the home in order to clean up the home.

....

Mother did not understand that old expired food was unhealthy. Mother indicated the children did not help in the home. The washing machine did not work in the home. Gnats and odors were a constant in the home. Services offered to correct the home condition [were] to no avail.

At the time of the removal, R.B. and the siblings were filthy. R.B. was three years of age and not potty trained. Their hair was matted and had to be shaved. The children's clothes were too small for them. The children had sores on their bodies....[4]

D.S. was born on January 30, 2011[,] and allowed to remain in Mother's care while services were offered through R.B.'s case. R.B. returned from a home visit with unexplained bruises and both children were removed on June 7, 2011. R.B. was age two at the time. Father tested positive for cocaine, morphine, codeine and heroin at the time of the children's removal.

....

Mother completed a psychological evaluation in 2009 which diagnosed her with Obsessive Compulsive Personality Disorder and Hoarding Disorder. Mother completed an initial clinical assessment which diagnosed her with Depression, PTSD, Hoarding Disorder, and OCD. Mother's parenting assessment diagnosed her with a hoarding disorder. Mother's psychiatric

---

[4] There were additional findings regarding the other siblings, some of whom were adults at the time of the current termination, who were also removed from the Parents' care and became wards of DCS during their youth.

evaluation diagnosed her with OCD, Schizoaffective Disorder, Hoarding Disorder and recommended medication for Mother. Mother refused all medications. Mother is not addressing her mental health issues.

Mother was offered intensive services in an effort to address her disorders. Homebased services were offered to address her living situation. Therapy was offered to Mother. Mother was not willing to cooperate with services…. After five years of attempted services, Mother has not progressed in any of the services.

Mother has not seen the children in three years. The children do not have a relationship with Mother. The visitations ceased due to not being in the children's best interest. The children would return from visits with severe diarrhea and behavior issues. Mother has been involved with [DCS] since 2009 pursuant to these children's CHINS matter and her other children. Mother has not corrected the problems that existed after eight years of attempted services. None of Mother's children reside in her care. Mother is still [in] no position to properly parent these children and have the children placed in her care. Mother has mental health issues which she is not addressing.

In September 2012, D.S. was shot in the eye when the children were playing with a pellet gun while visiting father, A.S. D.S. lost all vision in his eye and now has a prosthetic eye [that] requires cleanliness and special care which will be a lifelong chore. Mother was against the child receiving the prosthetic eye. Mother indicated that she had a family member with one eye and you would have to worry about infections with the prosthetic eye. The Court authorized the prosthetic eye for it is in the child's best interest.

Children were removed from [M]other's care from June 3, 2011 until May 1, 2012. Children were again removed January 14, 2013.…

….

Father testified that he began using drugs at the age of fourteen years old. Father indicted that he had a criminal history due to his drug usage and dealing drugs. Father testified that he has been arrested on more than five occasions and has spent time in prison. Father was ordered to participate in inpatient treatment for his substance abuse issues. Father refused and failed to complete any such program. Once the children were removed in June of 2011, Father completely stopped participating in all services. Father testified that he let Mother handle it. Father does not have contact with [R.B.].

Father failed to appear at the hearing set for the continuation of the fact finding hearing.

….

The children have special needs including Attention Deficit Hyperactive Disorder, [and] Oppositional Defiant Disorder. R.G. has [] been diagnosed with autism as well. The children need structure and continued services which they are receiving in their placement. The stability and permanency of the placement is essential for these children.…

…. For over eight years, the parents failed to utilize the available services and make the necessary efforts to remedy the conditions which led to intervention by DCS and the Court. The children continue to reside in a stable foster home which has indicated both a willingness and ability to adopt the children. There is a strong bond between the children and the foster parents. [DCS] has identified a satisfactory plan for the long term care and treatment of the children. It would be detrimental to the best interests of the children to disrupt the stability of their current placement. It would be unfair to the children to delay such permanency any longer on the very remote likelihood of the

parents committing to and completing services. Parents have not remedied the reasons for removal in eight years.

Father's App. at 2-5.

[3] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied by either parent; (2) there is a reasonable probability that the continuation of the parent-child relationship between Mother and the Children poses a threat to their well-being, and continuation of the parent-child relationship between Father and R.B. poses a threat to R.B.'s well-being; (3) termination of the parent-child relationship between Mother and the Children is in the Children's best interests, and termination of the parent-child relationship between Father and R.B. is in R.B.'s best interests; (4) DCS has a satisfactory plan for the care and treatment of the Children, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petitions to terminate parental rights by clear and convincing evidence and therefore terminated Mother's rights to both Children and Father's rights to R.B. Each of the parents now appeal.

## Discussion and Decision

[4] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights

when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id.* A petition for the involuntary termination of parental rights must allege in pertinent part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS must prove "each and every element" by clear and convincing evidence. *In re G.Y.*, 904 N.E.2d 1257, 1261 (Ind. 2009); Ind. Code § 31-37-14-2. If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

"We have long had a highly deferential standard of review in cases involving the termination of parental rights." *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility. We consider only the evidence and reasonable inferences favorable to the trial court's judgment. Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review: we first determine whether the evidence supports the findings and then determine whether the findings support the judgment. In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

Both Mother and Father challenge the sufficiency of the evidence supporting the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied, and that termination of their respective parental rights is in the Children's best interests. Mother additionally asserts that her trial counsel provided ineffective assistance such that she was deprived of the right to a fair trial.

# Section 1 – Sufficient evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

Mother and Father each assert that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied.[5] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id*. Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id*. (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial

---

[5] Both Father and Mother also argue that DCS failed to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address the sufficiency of the evidence regarding only one of the three requirements.

probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[8] DCS has been involved with this family since 2009, and began offering intensive services to help the family remedy the deplorable conditions of the home, Mother's mental health issues, and Father's addiction issues. After those services failed to remedy the circumstances, R.B. and his older siblings were removed from the home in February 2010, and D.S. was removed from the home five months after her birth in June 2011.

[9] Regarding Mother, DCS presented ample evidence showing a pattern of unwillingness to deal with parenting problems and to effectively cooperate with those providing social services. DCS presented evidence that Mother has a hoarding disorder as well as other mental health problems which has caused her to continually struggle to maintain an appropriate home environment for the Children. While Mother has participated in many services, she has failed to make sustainable progress. The record indicates that although Mother has made

slight improvements to the conditions of the home at times, these improvements were quickly followed by major setbacks. The Children have been returned to her care during the times of improvement, only to be removed again as the conditions spiraled out of control. Indeed, even Mother's visitation with the Children was stopped because Children would return from visits with severe diarrhea and behavior issues. After more than five years of being offered services to address her inability to provide a safe and stable environment for the Children, Mother admitted to a service provider that she "had blocked her mind off" and was unwilling to accept advice and make changes. Tr. Vol. 2 at 164.

[10] Mother points to evidence that, at the time of the termination hearing, she was participating in therapy to address her hoarding disorder and that she was now maintaining a clean home.[6] However, the trial court determined that Mother's long-term habitual inability to provide safety and stability for the Children was far more indicative of her future behavior than her more recent progress. This was the trial court's prerogative, and we will not second-guess that determination. We conclude that the evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from the home and continued placement outside of Mother's care will not be remedied.

---

[6] DCS Family Case Manager Linda Roberts testified that while the condition of Mother's home had indeed recently improved, she was concerned that Mother would revert to her old behaviors if Children were returned, just as Mother had done in the past when the Children were returned to her care. FCM Roberts also noted that Mother still kept expired and moldy food in her refrigerator and did not seem to understand the danger that posed to the Children.

[11] Regarding Father, at the time of R.B.'s removal from the home, Father tested positive for cocaine, morphine, codeine, and heroin. Father has an extensive criminal history due to his drug usage and drug dealing, and he admits that he has been arrested and imprisoned multiple times. He was ordered to participate in inpatient treatment for substance abuse issues, but he refused to and has not completed any such program. In fact, after June 2011, Father stopped participating in any services offered to Parents. While Father offers excuses for his failures, this is simply a request for us to reweigh the evidence, and we cannot. DCS presented sufficient evidence that there is a reasonable probability that Father will not remedy the conditions that led to R.B.'s removal and continued placement outside of Father's care.

## Section 2 – Sufficient evidence supports the trial court's conclusion that termination of both Father's and Mother's parental rights is in the Children's best interests.

[12] Both Parents assert that the evidence does not support the trial court's conclusion that termination of their respective parental rights is in the Children's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. "The historic

inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[13] Here, DCS Family Case Manager Linda Roberts testified that she had been involved with this family since 2009, and that intensive home-based services were put in place to help improve the home conditions, to no avail. She recalled the brief period in 2012 when the children were returned to Mother's care in an attempt at reunification and that although things started off well, "things started to progressively get worse" before the Children had to be removed from the home again. Tr. Vol. 2 at 215. Roberts noted Mother's recent improvements in the condition of her home but also noted her habitual failure to provide a safe and stable home for the Children. Roberts further emphasized Father's total failure to cooperate with services and his refusal to address his addiction problems. Roberts stated that she believed that termination of both parents' respective rights was in the Children's best interests because the Children "need stability and permanency and they will get that in their current foster home." *Id.* at 221.

[14] Similarly, the Children's therapist, Bennett Izeh, testified that termination of parental rights was in the Children's best interest. He opined that the Children had "been through" enough over the last several years and that "another

attempt at reunification" would cause the Children to regress from the substantial progress they had made with their preadoptive family. *Id*. at 171, 175. He emphasized the stability the Children had enjoyed since 2013, and the importance of that stability moving forward.

[15] Mother has not seen the Children, and Father has not seen R.B., in approximately three years. We remind both Father and Mother that the trial court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *See McBride,* 798 N.E.2d at 203. Moreover, DCS is under no obligation to prove, and the trial court is under no obligation to conclude, that R.B. or D.S. would not be doing well psychologically, emotionally, or physically had they remained in their respective Parents' care. Rather, as stated above, the trial court considers the totality of the evidence to determine if it is no longer in the child's best interests to maintain the parent-child relationship. These Children have suffered enough turmoil and uncertainty for a lifetime. We agree with the trial court's determination that it is time for the Children to move forward in a stable environment. DCS presented sufficient evidence to support the trial court's conclusion that termination of both Father's and Mother's respective parental rights is in the Children's best interests.[7]

---

[7] Mother challenges some of the trial court findings of fact as unsupported by the evidence. Even assuming that the trial court's findings are erroneous, we conclude that any such errors are harmless because they do not call into question the trial court's ultimate conclusion that termination of Mother's parental rights was in the Children's best interests. *See Matter of A.C.B.*, 598 N.E.2d 570, 573 (Ind. Ct. App. 1992) (affirming

# Section 3 – Mother was not denied the effective assistance of trial counsel.

[16] Finally, Mother claims she was denied the effective assistance of trial counsel at the termination hearing. In *Baker v. Marion County Office of Family & Children*, 810 N.E.2d 1035 (Ind. 2004), our supreme court set forth the following test to judge counsel's effectiveness in termination proceedings:

> Where parents whose rights were terminated [at] trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. The question is not whether the lawyer might have objected to this or that, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Id.* at 1041.

[17] Mother asserts that she received ineffective assistance because, even though DCS bore the burden of proof at the termination hearing, her counsel presented her case in chief before DCS presented its evidence or witnesses. *See generally* Ind. Trial Rule 43(D) ("[P]arty on whom rests the burden of the issues must first produce his evidence thereon; the adverse party will then produce his evidence which may then be rebutted."). As a result, Mother argues that her

---

termination of parental rights despite erroneous findings because error was "not of such magnitude that it calls into question the court's conclusion" that termination was in child's best interests).

counsel "could not possibl[y] anticipate all the evidence or testimony [DCS] would present." Mother's Br. at 28. Regardless, in addressing Mother's claim, we do not focus on the particular actions of her counsel. *Baker*, 810 N.E.2d at 1041. Instead, we consider whether counsel's performance was so defective as to undermine our confidence in the trial court's termination decision. *See Lang,* 861 N.E.2d at 376 (holding that counsel provided effective assistance where appellate court's confidence that trial court's order was supported by sufficient evidence had not been undermined).

[18] The record indicates that the court-appointed special advocate requested that Mother present her case in chief first since she had the most witnesses present in court on the day of the hearing. Tr. Vol. 2 at 7-8. There was no objection to this suggested procedure, and the trial court permitted Mother to present her evidence first. Mother's counsel presented eight witnesses for direct examination in her case in chief. Counsel also extensively cross-examined five of DCS's six witnesses and recalled Mother as a rebuttal witness after DCS rested. While the procedure utilized may not have been the norm, we cannot say that counsel's overall performance was defective as to undermine our confidence in the trial court's termination decision. As stated above, sufficient evidence supports the trial court's conclusions that the conditions leading to the removal of the Children from Mother's care are unlikely to be remedied and that termination of Mother's parental rights is in the Children's best interests. Mother was not denied the effective assistance of counsel.

In sum, we will reverse a termination of parental rights only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made. *C.A.*, 15 N.E.3d at 92-93. Based on the record before us, we cannot say that the trial court's termination of Mother's rights to both Children and its termination of Father's rights to R.B. was clearly erroneous. We therefore affirm the trial court's judgment.

Affirmed.

Robb, J., and Bradford, J., concur.