## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Mar 04 2020, 7:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander W. Robbins
Bloomington, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of Parental Rights of: J.K. (Minor Child), and<br><br>F.K. (Mother),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner* | March 4, 2020<br><br>Court of Appeals Case No. 19A-JT-2341<br><br>Appeal from the Morgan Circuit Court<br><br>The Honorable Matthew G. Hanson, Judge<br><br>Trial Court Cause No. 55C01-1903-JT-83 |

**Baker, Judge.**

F.K. (Mother) appeals the trial court's order terminating her relationship with her child, J.K. (Child). Mother argues that (1) her attorney was ineffective for failing to move to dismiss the termination proceedings when it exceeded the statutory time limit; and (2) the evidence is insufficient to support the termination order. Finding that Mother's attorney was not ineffective and that the evidence is sufficient, we affirm.

# Facts

Mother has a prior history with the Department of Child Services (DCS). At some point in the past, she had a Child in Need of Services (CHINS) case that ended in the termination of her parent-child relationship with another child; the primary issue in that case was substance abuse.

Child was born on November 8, 2017,[1] and was removed from Mother's care less than a month later after Mother was arrested on drug and drug paraphernalia charges.[2] On December 18, 2017, DCS filed a petition alleging that Child was a CHINS based on Mother's arrest and other allegations. On January 18, 2018, Mother admitted that Child was a CHINS because "she is facing criminal charges, that she has ongoing substance abuse issues, that she is enrolled in [Intensive Outpatient Treatment] now, [and] that she has issues with

---

[1] It appears that Child's father has never been a part of her life. He did not appeal the termination of his parental rights.

[2] Child was originally placed in relative care but later moved to foster care after allegations of inappropriate behavior on the part of the relative caregivers.

stability." Tr. Ex. 7. At the dispositional hearing, the trial court ordered Mother to participate in services, including completing a substance abuse assessment and complying with all recommendations, submitting to random drug screens, and participating in group and individual counseling. Mother was also ordered to maintain stable and appropriate housing and income, and she was informed that any missed drug screen would be assumed to be positive.

[4] From February 16 through March 22, 2018, DCS collected three drug screens that were positive for illegal substances including methamphetamine. Over the course of the rest of 2018, Mother did not have any positive drug screens, but she failed to report for screens on many occasions.

[5] In April 2018, Mother failed to participate with most of her services, though she did participate sporadically with intensive outpatient treatment (IOP). After she had issues with someone in her IOP group and began to fail to attend, she was moved to a new IOP group. By mid-May, Mother was no longer permitted to attend the new IOP group because of her attitude and unwillingness to participate. At some point she resumed participation with IOP and successfully completed the program in November 2018. She did not, however, complete the required aftercare program or the recommended follow-up services of individual therapy, life skills, and recovery coaching.

[6] Things began to improve for Mother in July 2018, when she participated in IOP, therapy, and home-based case management. DCS began to move Mother and Child to semi-unsupervised visits because of the progress Mother was

making. By late August 2018, Mother had moved in with her boyfriend, C.B.,[3] on whom she relied financially. DCS tried to get C.B. involved in services but Mother refused to provide his contact information to get the process started.

[7] In October 2018, Mother's therapist became aware of fighting between Mother and C.B. and recommended that they obtain couples counseling. On November 8, 2018, Mother told her therapist that C.B. was high and throwing things at her; the police were called and C.B. left the home. Following this incident, service providers determined that Mother was not taking her medication and had permitted C.B. to return home despite agreeing not to. She kicked her therapist out of the house during a session and began minimizing the domestic violence issues. On November 25, 2018, C.B. was arrested following a domestic violence incident.[4]

[8] In December 2018, Mother was living in a shelter, had no transportation, and was unemployed. She reported a relapse on methamphetamine and heroin and also reported that she was pregnant. As a result of the relapse and other issues, DCS referred Mother for a new substance abuse evaluation and a psychological evaluation. Mother failed to attend the substance abuse evaluation and, in January 2019, was discharged from visitation, individual therapy, and home-based case management for noncompliance. She also left the shelter because

---

[3] At some point during the CHINS case, Mother and C.B. got married.

[4] Mother later reported to a therapist that C.B. had dragged her by her hair and raped her.

she did not want to follow the rules. In February 2019, Mother disappeared, failing to show up for her rescheduled psychological evaluation and failing to attend multiple drug screens. Mother later admitted that her December 2018 relapse continued through March 2019 and included almost daily drug use.

[9] On March 1, 2019, DCS filed a petition to terminate the parent-child relationship between Mother and Child. A few days before the initial hearing on March 21, 2019, Mother and C.B. were arrested on drug-related charges after she was found in a residence with C.B. where drugs were being used. She was in the Morgan County Jail at the time of the initial hearing. In late March, Mother was released from jail but failed to participate in any services or keep in contact with DCS. In April, Mother failed to provide DCS with her current address or a working phone number, attend a psychological evaluation, or attend multiple drug screens.

[10] In May 2019, Mother completed a substance abuse and parenting assessment and was recommended for services, including domestic abuse counseling. She moved to the Julian Center but did not attend the recommended services and failed, on multiple occasions, to attend random drug screens. Later that month, she moved to Crawfordsville and began participating with some services there. In June 2019, Mother gave birth and her newborn died shortly thereafter.

[11] In July, Mother finally completed a psychological evaluation and began participating with IOP again. The psychological evaluation resulted in diagnoses of major depression, anxiety, post-traumatic stress disorder, drug

disorders, and schizoaffective disorder, and she was deemed paranoid and delusional. She had just begun counseling and medication to address these issues in the weeks leading up to the termination hearing. Mother reported to her counselor that she and C.B. had had numerous incidents of domestic violence, often tied to occasions when they were drinking alcohol.

[12] Over the course of the CHINS case, Mother lived in Martinsville, Indianapolis, and Crawfordsville, with friends and in shelters and motels. She was removed from at least two facilities for noncompliance. A few weeks before the termination hearing, Mother moved into transitional housing with C.B. through a service provider in Crawfordsville. Mother was unemployed, as she had been throughout most of the CHINS case, and at some point before the termination hearing, C.B. lost his job. They had both received multiple infractions through the service provider and were at risk of being discharged from the program and losing their housing. Shortly before the third and final day of the termination hearing, Mother and C.B. were each employed and had secured an apartment.

[13] The termination hearing took place over the course of August 22, August 27, and September 5, 2019. The second day of the hearing was day 179 of the 180-day statutory period.[5] Counsel for Mother requested additional time to

---

[5] Indiana Code section 31-35-2-6(a)(2) requires that the factfinding hearing on a petition to terminate parental rights "shall" be completed not more than 180 days after the petition was filed.

complete her presentation of evidence and did not object when the third day of the hearing was set outside of the 180-day period.

[14] On September 9, 2019, the trial court issued a lengthy and detailed order terminating Mother and Child's parent-child relationship. In pertinent part, it concluded as follows:

> 208. The mother's drug issues have not been remedied, have controlled most of her adult life and have continued up to a time after this termination case was filed.
>
> 209. That while mother has taken very recent steps to remedy her drug issues it is clearly reasonable to believe from her testimony, her actions and her history with DCS that these are only temporary and very late to address her very serious drug issues.
>
> &ast;&ast;&ast;
>
> 226. Since the start of this case [Mother] has stayed nowhere for any significant period of time and has not taken the steps necessary, until just last week, to find a place of her own.
>
> 227. That this stability issue is unacceptable over such a long period of time and the short period of stability over the last few months does not overcome this finding.
>
> &ast;&ast;&ast;
>
> 230. That once more, only after the termination case was filed and only in the past two months has mother found work.

***

236. That over the life of this case mother has denied any issues with domestic violence and only recently (on the stand at the last hearing and in counseling) has admitted there may be some domestic violence issues.

***

239. That the husband is clearly a poor choice in relationships, was a clear catalyst for leading mother to end her services in 2018, return to a drug life from December of 2018 to March of 2019 and only after the termination case was filed is he involved in some services in this case.

***

249. That had the mother gone to any one of the [psychological] assessments back in 2018 she might have been able to start to tackle these very serious [mental health] issues.

250. However, as noted throughout this case, she did not take the necessary steps and once more, only in the last two months, has decided perhaps her mental health issues are a priority.

***

254. That the drug issues continued until only after this termination was filed, the instability is still in question as mother just obtained her own housing and is now married to a batterer and partner in drug use, and mother's mental

health issues are beyond a simple challenge that can be easily be overcome.

\*\*\*

262. That clearly if boyfriend/husband presents a danger to the mother and those issues have not been addressed, then he would present a danger to the child if the child was returned to mother.

263. That mother testified that she lost another child to the DCS system at a time when she did not want to "fight" for that child.

\*\*\*

266. The mother admitted to using heroin and methamphetamine "daily" from December of 2018 to March of 2019.

267. That mother was aware of the pregnancy during those times.

\*\*\*

272. That if mother is willing to place an unborn child in such a position and is willing to simply "not fight" for another live child that was lost to DCS, it is fair to assume that somewhere down the road this child would be in serious danger if mother simply decided to give up or return to drug use as she has done for most of her adult life.

\*\*\*

280. . . . [I]n a controlled [supervised visitation] environment free of drugs, domestic violence, with proper shelter and supervision of the mother, things [between Mother and Child] are great and the relationship is strong.

281. That without these services and things in place, this court is not convinced[] that this relationship overcomes the very real threats facing this child with this parent.

\*\*\*

287. This child has waited most of her life for her mother to get her act together.

\*\*\*

291. . . . [O]nly after the death of her third child has the mother decided it was time to look after the best interests of this child.

\*\*\*

293. . . . [E]ven after the termination was filed she took few steps to get reengaged in services until after the death of her infant which suggests she is responding finally here out of a deep sadness rather than what is in the best interests of this little girl that has been without a mother for most of her life.

Appealed Order p. 15-23. Mother now appeals.

# Discussion and Decision

## I. Assistance of Counsel

First, Mother argues that her trial counsel was ineffective for failing to object when the third day of the factfinding hearing was set outside the 180-day window mandated by Indiana Code section 31-35-2-6(a)(2).

Indiana has chosen to provide counsel in termination proceedings to all parents who are indigent. *Baker v. Marion Cty. Office of Family & Children*, 810 N.E.2d 1035, 1038 (Ind. 2004). Those parents have a right to effective assistance, but the measure of counsel's performance is not identical to that applied in the criminal justice context. Instead, our Supreme Court has held that the following standard is applied to the performance of counsel in termination of parental rights cases:

> Where parents whose rights were terminated upon trial claim on appeal that their lawyer underperformed, we deem the focus of the inquiry to be whether it appears that the parents received a fundamentally fair trial whose facts demonstrate an accurate determination. *The question is not whether the lawyer might have objected to this or that*, but whether the lawyer's overall performance was so defective that the appellate court cannot say with confidence that the conditions leading to the removal of the children from parental care are unlikely to be remedied and that termination is in the child's best interest.

*Id.* at 1041 (emphasis added).

When a parent does not object to a hearing being set outside of the 180-day limit, any objection is waived and the result of the termination proceeding may stand. *In re N.C.*, 83 N.E.3d 1265, 1267 (Ind. Ct. App. 2017). Here, Mother's attorney did not object, and she argues that he was ineffective for failing to do so. Had he objected, she maintains that she would have had more time to prove her stability and show that she was serious about participating with services and bettering herself as a parent.

Mother's argument is precisely what was foreclosed by our Supreme Court— that her attorney was ineffective for failing to object at one singular point in the hearing. She even acknowledges that "the actual proceedings conducted in this case were not unfair. [Trial counsel] did a wonderful job of crossing and pushing back on DCS witnesses, and in arguing on his client's behalf." Appellant's Br. p. 24 n.3. And indeed, having reviewed the record, it is apparent that her attorney did as good a job as could be done with a challenging set of facts. In no event does the record support a conclusion that counsel's overall performance was so defective that the factfinding hearing was fundamentally unfair. Therefore, we decline to reverse on this basis.

## II. Termination

Next, Mother argues that the evidence is insufficient to support the termination of her relationship with Child. Our standard of review with respect to termination of parental rights proceedings is well established. In considering whether termination was appropriate, we neither reweigh the evidence nor

assess witness credibility. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1229 (Ind. 2013). We will consider only the evidence and reasonable inferences that may be drawn therefrom in support of the judgment, giving due regard to the trial court's opportunity to judge witness credibility firsthand. *Id.* Where, as here, the trial court entered findings of fact and conclusions of law, we will not set aside the findings or judgment unless clearly erroneous. *Id.* In making that determination, we must consider whether the evidence clearly and convincingly supports the findings, and the findings clearly and convincingly support the judgment. *Id.* at 1229-30. It is "sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005) (internal quotations omitted).

[20] Indiana Code section 31-35-2-4(b)(2) requires that a petition to terminate parental rights for a CHINS must make the following allegations:

(A) that one (1) of the following is true:

(i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

(ii) A court has entered a finding under IC 31-34-21-5.6 that reasonable efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made.

(iii) The child has been removed from the parent and has been under the supervision of a local office or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K.*, 989 N.E.2d at 1230.

[21] Mother argues that the evidence does not support the trial court's conclusion that there is a reasonable probability that the conditions resulting in Child's

removal and continued placement outside of her care and custody will not be remedied. The trial court identified three broad categories of reasons for the original and continued removal of Child from Mother: (1) substance abuse; (2) instability in housing and life, including employment and her relationship with her husband; and (3) Mother's mental health struggles.

[22] With respect to Mother's substance abuse, the record reveals that in February and March 2018, she provided three drug screens that were positive for methamphetamine. Then she relapsed in December 2018. Her relapse continued through March 2019, and she later admitted to nearly daily use of substances, including heroin and methamphetamine, even though she knew that she was pregnant at that time. During her periods of sobriety, she has provided some clean screens, but she has also failed to report for countless other screens, which are considered to be positive. While she completed an IOP program, she failed to participate with or complete the required aftercare services. It appears that Mother was clean and in substance abuse services at the time of the factfinding hearing, but when her habitual patterns of conduct and the overall history of the case—as well as the fact that her parental rights as to another child were terminated in the past because of her substance abuse— are considered, the outlook is not promising.

[23] With respect to Mother's stability, she argues that as of the final day of the termination hearing, she had an apartment and a job, was making ends meet financially, and had had no recent episodes of domestic violence with her husband. Our Supreme Court has observed that it is within the discretion of the

trial court to "disregard the efforts [a parent] made only shortly before termination and to weigh more heavily [the parent's] history of conduct prior to those efforts." *K.T.K.*, 989 N.E.2d at 1234. Here, even if we only turn the clock back to the time at which DCS filed the termination petition, Mother was arrested shortly thereafter. Upon her release, DCS referred more services for Mother but she failed to participate for months. It was not until four months after the termination petition was filed that Mother finally completed required assessments, and she never participated in a second round of IOP treatment.

[24] Mother's housing was unstable throughout all the CHINS and termination cases. She moved from town to town and from motels to shelters to friends' couches. She was kicked out of two shelters for noncompliance. Therefore, the fact that shortly before the third and final day of the termination hearing she and C.B. had managed to secure an apartment does not outweigh her lengthy history of housing instability.

[25] As to her life stability, she continues to live with her husband, C.B., who has allegedly battered and raped her in the past. Throughout the CHINS case, Mother refused to acknowledge the domestic violence in her relationship and did not even report it to DCS until DCS learned about it through a police report. It was not until the termination hearing that she finally admitted to the issue. Neither Mother nor C.B. has ever participated fully with a program of treatment designed to address domestic violence. Multiple service providers testified that they would have serious concerns about Child's safety if she were

placed with Mother and C.B. because of the ongoing, untreated domestic violence in the home.

[26] Finally, with respect to Mother's mental health issues, she failed to complete a required psychological assessment despite the many times it was scheduled in 2018 and 2019 until July 2019, four months after the termination petition was filed. At that time, Mother was diagnosed with a number of serious mental health problems and began to be treated for those diagnoses, including therapy and medication. As the trial court noted, had she completed the assessment a year earlier, she would have been able to show a track record of treating and coping with the diagnoses. But because she waited until the end of the termination proceedings to complete the assessments, the trial court was unable to evaluate her progress or the likelihood that she would become healthy enough to be a safe and appropriate parent.

[27] Mother seemed to have made some progress on many of her obstacles in the days leading up to the third and final day of the termination hearing. But given the evidence in the record, we cannot second-guess the trial court's conclusion that it was simply too little, too late. Her patterns of an inability, unwillingness, or lack of commitment to address her issues, to cooperate with services, and to abide by the trial court's orders demonstrate that there is a reasonable probability that the conditions resulting in Child's original and continued removal from her care and custody will not change. Mother's arguments to the

contrary amount to a request that we reweigh the evidence, which we may not do.[6]

[28] The judgment of the trial court is affirmed.

Riley, J., and Brown, J., concur.

---

[6] Mother also argues that the evidence does not support a conclusion that there is a reasonable probability that the continuation of her relationship with Child poses a threat to Child's well-being. As the statutory elements are phrased in the disjunctive, we need not consider this argument, but we note that the evidence already discussed herein likewise supports the trial court's conclusion on this element of the termination statute.