## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 20 2020, 10:14 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Harold E. Amstutz
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Catherine Brizzi
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of A.G. (Child) and S.R. (Mother),

S.R. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

July 20, 2020

Court of Appeals Case No.
20A-JT-557

Appeal from the Tippecanoe Superior Court

The Honorable Faith Graham, Judge

Trial Court Cause No.
79D03-1909-JT-128

**May, Judge.**

[1] S.R. ("Mother") appeals the termination of her parental rights to A.G. ("Child"). Mother argues the Department of Child Services ("DCS") did not present sufficient evidence to support some of the trial court's findings. Mother also contends the trial court's findings do not support its conclusions that the conditions under which Child was removed from Mother's care would not be remedied and that termination of Mother's parental rights was in Child's best interests. We affirm.

## Facts and Procedural History

[2] Mother is the biological mother of Child, born April 4, 2017. On April 30, 2018, DCS received a report that C.G., II ("Father")[1] was "smoking spice in [Child's] presence." (App. Vol. II at 12.) After an investigation, DCS determined the report was untrue, as Child was not with Father at the time because Mother, who was homeless, left Child in Paternal Grandmother's care. On May 19, 2018, DCS received a second report involving Child, which alleged substance abuse at Paternal Grandmother's home, where Child was living. Police arrested Paternal Grandmother for substance offenses and placed her in Community Corrections. Mother took Child to Maternal Step-grandfather's home because Mother was "still unemployed and homeless." (*Id.*)

---

[1] The parental rights of Father were also terminated. Father does not participate in this appeal.

[3]     On June 4, 2018, DCS received a third report regarding Child's care, this time alleging Father was using illegal drugs. An investigation revealed Father had been arrested on charges related to substance abuse and evading law enforcement. Additionally, DCS discovered that Paternal Grandfather and Paternal Step-grandmother lived with Maternal Step-grandmother and Child. Paternal Grandfather was involved in another DCS case and had recently tested positive for methamphetamine. Child was subsequently tested for the presence of illegal substances and tested positive for methamphetamine. At the time, Mother was still unemployed, homeless, and unable to care for Child. Mother had also been diagnosed with mental illness and was not in treatment or taking medication therefor.

[4]     On June 7, 2018, the trial court issued an emergency order placing Child under DCS's wardship. DCS placed Child with a foster family, with whom Child has remained throughout these proceedings. DCS filed a petition to adjudicate Child as a Child in Need of Services ("CHINS") on June 7, 2018. The trial court held a fact-finding hearing on the petition on August 9, 2018, and Mother admitted she was unable to care for Child.[2] On August 17, 2018, the trial court adjudicated Child a CHINS. On September 27, 2018, the trial court held a dispositional hearing and issued an order requiring Mother to participate in certain services including home-based case management, mental health

---

[2] Father was incarcerated and did not attend the fact-finding hearing.

assessment and recommended treatment, parenting assessment and parenting education, visitation with Child, drug screens, and individual therapy.

[5] Mother was granted supervised visitation with Child and did not progress to unsupervised visitation. The visitation supervisor reported Mother was often unprepared for visits, which resulted in visits ending early because Mother did not bring diapers or food for Child. Mother also was often distracted by her phone or by fighting with her boyfriend. The visitation supervisor testified that when Mother's parenting behavior was corrected or redirected, Mother would become defensive.

[6] Throughout the CHINS proceedings, Mother had approximately three different jobs and lived in five different locations. Mother applied for social security disability benefits based on her mental health diagnosis but did not attend a follow up appointment and therefore was automatically denied. Mother has not completed the appeal paperwork to obtain social security disability. DCS helped Mother and her boyfriend get an apartment, but they were ultimately evicted for non-payment of rent. While in the apartment, Mother would allow homeless people to use her shower and another person staying at the residence had to be transported to the hospital for an alleged overdose.

[7] Mother attended some home-based case management appointments, which focused on budgeting and other home management skills. Mother refused to learn to manage her money and would give her boyfriend her paychecks to put

into a savings account that she could not access. Mother did not know what boyfriend did with her money.

[8] Based on Mother's noncompliance with services, DCS filed a petition to terminate Mother's parental rights to Child on September 12, 2019. On November 25, 2019, the trial court held an evidentiary hearing on the matter. On February 21, 2020, the trial court issued an order terminating Mother's parental rights to Child.

# Discussion and Decision

[9] We review termination of parental rights with great deference. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[10] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837.

The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id.*, but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id.* at 836.

[11] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

# 1. Challenged Findings

When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

As an initial matter, Mother argues:

> The courts [sic] findings as to the Mother did not accurately reflect the totality of evidence presented in the exhibits and testimony. Findings #10 through #20 and #22 through #26 are inaccurate as they present in detail any and all negative information about [Mother], without presenting the positive information in the same manner.

(Br. of Appellant at 15.) However, Mother does not cite the positive evidence the trial court allegedly did not consider, and she does not make a specific argument as to how these findings are clearly erroneous. "Bald assertions of error unsupported by either cogent argument or citation to authority results in waiver of any error on review." *Pasha v. State*, 524 N.E.2d 310, 314 (Ind. 1988). Waiver notwithstanding, Mother does not contest the factual accuracy of the findings; instead she challenges the set of facts upon which the trial court based its conclusions. On appeal, we cannot reweigh the evidence or judge the

credibility of witnesses, *In re D.D.*, 804 N.E.2d at 265, and thus her arguments regarding those findings fail.

[14] Mother also contends "[m]any of the courts [sic] findings (#[27-35]) are exclusively regarding the father and should not be considered as to whether the Mother's rights should be terminated." (Br. of Appellant at 15.) However, she does not cite the record or case law regarding why we should not look at all of the trial court's findings to consider whether DCS established the required elements to terminate her parental rights, and thus her argument is waived for failure to make a cogent argument. *See* Indiana App. Rule 48(A)(6) (issue must be supported by cogent argument, including citations to the record and relevant case law); *and see Castro v. State Office of Family & Children*, 842 N.E.2d 367, 373 n.2 (Ind. Ct. App. 2006) (failure to present a cogent argument waives the issue on appeal), *trans. denied.* Waiver notwithstanding, we note that the trial court did not solely rely on the findings as to Father in making their decision to terminate Mother and Father's parental rights and, as we discuss infra, there were sufficient findings to support the trial court's conclusions regarding the termination of Mother's parental rights absent the findings concerning Father.

[15] Mother also challenges Finding 21, which states, "Mother was fairly compliant with drug screens until August of 2019." (App. Vol. II at 15.) Mother contends "Finding #21 is not a fair description of the drug screen evidence." (Br. of Appellant at 15.) The Family Case Manager ("FCM") testified that, prior to August 2019, Mother "submitted to probably about ninety-five percent of her drug screens" but was then "suspended due to non-compliance" in August

2019. (Tr. Vol. II at 142-3.) Mother's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do See *In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge credibility of witnesses).

[16]     Therefore, we conclude, based on the FCM's testimony, the evidence supported Finding 21. Mother does not properly challenge any of the trial court's other findings, so they stand as proven. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) (unchallenged findings accepted as true on appeal).

## 2. Reasonable Probability that Conditions Not Remedied

[17]     A trial court must judge a parent's fitness to care for her child at the time of the termination hearing. *In re A.B.*, 924 N.E.2d 666, 670 (Ind. Ct. App. 2010). Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Mother argues DCS did not present sufficient evidence to support the trial court's findings and those findings do not support its conclusion that the conditions under which Child was removed from Mother's care would not be remedied.[3]

---

[3] Mother also seems to challenge the services offered to her by DCS. She contends DCS did not make referrals to certain services and "[i]t is not enough that the DCS just offer standard, boilerplate, one size fits all, services. Every case requires the DCS to tailor services so they will help the parent." (Br. of Appellant at 19.) However, Mother cannot challenge the services provided by DCS to attack a termination order. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct. App. 2009) ("a failure to provide services does not serve as a basis

[18] The trial court found Child was removed from Mother's care because Mother was "in an unstable living situation, unemployed, and unable to care for [Child]." (App. Vol. II at 12.) Additionally, "Mother had been previously diagnosed with bipolar disorder but was not in treatment or taking medication." (*Id.*) Leading up to the adjudication of Child as a CHINS, Mother left Child in the care of various family members because of her housing instability. However, these family members consumed illegal drugs, including in Child's presence.

[19] To support its conclusion that there is a reasonable probability that the conditions under which Child was removed from Mother's care would not be remedied, the trial court found:

> 10.  Mother was referred to home-based case management services to assist her with housing, employment, accessing resources, and establishing appropriate boundaries. Mother failed to make sustainable progress in home-based case management. Mother was unsuccessfully discharged from two providers and is currently working with a third provider. Mother struggled to stay awake during some sessions, stayed in bed during some sessions, and missed many sessions. Providers found it difficult to schedule appointments and communicate with Mother. Mother frequently double-booked appointments despite case managers [sic] work with her on this issue. Mother

on which to directly attack a termination order as contrary to law"); *and see In re B.D.J.*, 728 N.E.2d 195, 201 (Ind. Ct. App. 2000) ("a parent may not sit idly by without asserting a need or desire for services and then successfully argue that he was denied services to assist him with his parenting").

was not honest with providers about her progress. Mother also had anger issues and made threats to one provider.

11. Mother failed to demonstrate that she could provide [Child] with a stable living situation. When the CHINS case started, [M]other was living with different friends and relatives, then she and her boyfriend rented from a friend. After they were evicted, [M]other and her boyfriend lived with her boss for a period of time. In October of 2018, Mother and her boyfriend obtained an apartment with financial assistance of DCS. Mother had very little furniture, only one or two toys, and limited clothing for [Child]. Case management assisted Mother with upkeep and maintenance of the apartment and helped Mother work with the landlord to make sure bills were being paid. After several months in the apartment, Mother and her boyfriend moved into a bigger apartment and their rent increased from $550 to $750. Mother and her boyfriend quickly got behind on rent and case management worked with Mother on options. Mother failed to follow through with paperwork and was evicted in July of 2019 for failing to pay rent and disturbing the neighbors. After being evicted, Mother declined to stay in a shelter and moved to a friend's house out of town. Mother returned to Lafayette after a short time and again stayed with different friends and relatives, one of whom recently tested positive for drugs. Mother refused to disclose her current housing situation to DCS so that the appropriateness for [Child] could be determined. At the evidentiary hearing, Mother indicated that she is living with a new boyfriend and his relatives. Mother's new boyfriend has children, but they live with his mother and sister.

12. Mother struggled to maintain the cleanliness of the apartment and it often smelled of smoke and cats. Mother also allowed inappropriate people to stay in the home, such as allowing homeless people to shower. One of the friend's [sic] Mother allowed to stay in the apartment overdosed. Mother and her boyfriend also allowed a minor to stay in the home with them

for several months until police issued a trespass warning against the minor.

13. Mother failed to demonstrate that she could financially provide for [Child] through employment or obtaining disability. Throughout the CHINS case, Mother struggled to maintain employment for more than a few weeks or months. Mother was unemployed from April of 2019 until October of 2019. Mother does not have a high school diploma, which limits her employment opportunities. Mother is currently unemployed.

14. After Mother completed a psychological evaluation, it was recommended that Mother apply for social security disability. Mother completed a phone appointment but failed to attend a follow up appointment. Mother requested appeal paperwork but failed to complete it despite multiple prompts and offers of assistance from her case manager.

15. For most of the CHINS case, [M]other was completely dependent on her boyfriend for scheduling, financial decisions, emotional regulation, and parenting [Child]. Mother gave all her paychecks to her boyfriend, who would put the money into a savings account that Mother could not access. Case management worked with Mother and her boyfriend to budget their money, but Mother and her boyfriend were unable to establish where their money was spent. When they received a tax refund, Mother and her boyfriend spent all the money and did not pay towards rent even though both of them had lost their jobs. When the relationship ended in July of 2019, Mother struggled and did not believe she could make it on her own. Mother wanted her ex-boyfriend to continue to control her finances and wanted him to be the payee if she obtained disability.

16. Case management also worked with Mother on her hygiene. Despite many prompts, Mother was often observed to have body odor and greasy hair. Mother would go weeks without showering even though she had access to a shower. Mother also failed to wash her clothes. Mother struggled with hygiene issues with [Child] as well.

17. Mother completed a mental health assessment with Child and Family Partners in October of 2018. Mother reported domestic violence in her relationship with Father and disclosed losing two (2) pregnancies to domestic violence incidents. Mother also disclosed sexual abuse by her stepfather and a family member. The assessment recommended that Mother have a medical and psychological evaluation to determine whether a disability diagnosis was warranted. Case management was also recommended as it was noted that Mother struggled with keeping track of appointments, setting a routine, and incorporating "unforeseeable events into her responsibilities without causing undue stress." It was also noted that Mother "appeared to have minimal [sic] slower cognitive processing" but it did not interfere with her ability to participate in the assessment. Mother reported that her learning disability did not impact her ability to function in daily life.

18. Mother completed the psychological evaluation in March of 2019 and the report was completed in April of 2019. Mother appeared at the psychological evaluation wearing pajamas, smelling unpleasant, and having greasy and unclean hair. Mother was diagnosed with Intellectual Disability Mild and Adjustment Disorder with Mixed Anxiety and Depressed Mood. The testing indicated that Mother "may not understand information the way others do, and she may take significantly more time than her peers to learn new information." It was also noted that Mother would likely struggle to understand information regardless of how it was presented to her. Mother's reading level was determined to be a 5th grade level. It was

reported that Mother's "cognitive abilities are very likely impeding her ability to function effectively, and independently, in her daily life." Mother has become dependent on others for support and this dependency combined with her poor social judgement place Mother as a high risk of entering and struggling to leave unhealthy relationships. It was recommended that Mother be provided with written material at a 5th grade level and that it be explained thoroughly. It was recommended that Mother be asked to say what she heard in her own words and that modeling and repetition be used to teach new skills. Therapy and case management were recommended for Mother and it was also suggested that she apply for disability.

19. DCS addressed Mother's cognitive struggles by having home-based case management work with [M]other to understand all written materials and written materials presented were a level that Mother should have been able to understand. Case managers noted that Mother had a short attention span and would get restless and fidgety after ten (10) minutes. Further, if too much direction was given, Mother would get defensive and lash out at case managers. To address this, case management was done in little segments to help [M]other process better.

20. Mother participated in individual therapy with Child and Family Partners to address past trauma and relationships, scheduling, developing positive supports, and unstable employment. Mother participating [sic] fairly consistently from December of 2018 to March of 2019. Mother then participated in individual therapy with Valley Oaks from May to October of 2019. Therapy focused on communication skills, healthy relationships, and anger management. Mother attended four (4) sessions and made minimal progress. Mother was discharged in October of 2019 due to missing seven (7) sessions. Mother indicated that she did not go to therapy because she did not like to talk to people about her feelings.

21.  Mother was fairly compliant with drug screens until August of 2019.

22.  Mother participated in parenting education with three different providers.  Goals included improving bonding and attachment, understanding the importance of stability and appropriate relationships, and understanding age development and milestones.  Cases [sic] managers also worked with Mother on nutrition, safety, cleanliness, and hygiene.  Information was demonstrated and modeled by case managers and written materials were also provided.

23.  Mother never progressed beyond semi-supervised visits with [Child].  Mother missed multiple visits and some visits had to be ended early due to lack of food and supplies.  When Mother attended visits, she was loving and affectionate to [Child].  Providers noted that Mother failed to supervise [Child], became angry and yelled at [Child], had to be reminded to put her phone away, and failed to clean [Child] appropriately.  Mother tried to get [Child] to stay in bed with her during visits and Mother had to be reminded to get up and interact with [Child].  Mother raised her voice at [Child] causing [Child] to withdraw, then Mother would get frustrated.  The provider noted that Mother would tell [Child] to "sit," "stay," and "no" as if she was a dog.  One visit was ended early after Mother yelled at [Child] and could not de-escalate after being warned.  Mother then threw her phone, which upset [Child].

24.  Mother is currently allowed to visit with [Child] for up to seven (7) hours per week but she usually does not utilize the entire amount.  The visits are approximately 75-80% supervised in the community and the provider remains within sight or hearing distance of Mother.  Mother continues to be unprepared with supplies and she is distracted by her phone during visits.  Despite months of supervised visits and parenting education, Mother continues to struggle with basic care of [Child], such as

providing food and supplies, appropriately feeding [Child], and remembering to change her diaper without being prompted. The provider recommends reducing Mother's visits due to Mother missing visits and ending visits early. She recommends visit [sic] occur only one (1) time per week until Mother can consistently visit and provide the necessary supplies.

25. Mother admitted that she does not have the means to care for [Child] and she is not ready to have [Child] in her care.

(App. Vol. II at 13-16.)

[20] Mother argues the trial court's findings do not support its conclusion that the reasons for Child's removal from her care would not be remedied because the trial court did not determine Mother was "unfit" and "whether this case had reached the 'last resort stage' by the time of the trial." (Br. of Appellant at 16.) In support of her argument, Mother cites *Matter of D.T.*, 547 N.E.2d 278 (Ind. Ct. App. 1989), *reh'g denied*, in which a panel of our court agreed with a mother's argument that "factors such as low income or inadequate housing are by themselves not sufficient grounds to terminate parental rights." *Id*. at 285. However, the court also recognized the well-established standard of our review that "termination may be based on evidence of recurring events up until the time of removal." *Id*. Here, the termination of Mother's parental rights to Child was based not only on her lack of stable housing and employment, but also her lack of progress in services and inability to parent Child properly during visits.

[21]     Mother also relies on *Matter of M.I.*, 127 N.E.3d 1168 (Ind. 2019), in which our Indiana Supreme Court held that a mother's parental rights could not be terminated based on the "singular conclusion" of that "[m]other's ongoing inability to secure suitable housing[.]" *Id*. at 1171. However, the facts of *Matter of M.I.* are distinguishable from those in this case. In *Matter of M.I.*, our Indiana Supreme Court affirmed the trial court's decision to deny DCS's petition to terminate the mother's parental rights to her children because, while the mother struggled with finding suitable housing, she and her children "shared a 'strong, loving bond[,]'" and the mother "had made progress complying with her parent-participation plan." *Id*. The Court noted the mother did not have personal transportation and "went to counseling and visitations by foot[,]" and DCS case managers conceded that the requirements of the parental participation plan were "cumbersome, often requiring Mother to be in three or four different places in a given week, while also keeping a job, attending visitations, and looking for housing." *Id*.

[22]     Here, Mother's parental rights were not terminated based solely on her inability to secure housing.[4] The trial court found she was also unable to secure employment, did not participate in services, had ongoing hygiene issues, and did not interact well with Child. Mother never progressed past supervised visits

---

[4] Mother also argues her parental rights cannot be terminated based "solely" on Mother's mental health struggles. (Br. of Appellant at 18.) However, as we have noted, the trial court made a number of findings regarding a number of different issues, including Mother's unwillingness to address her mental health issues, when considering whether to terminate Mother's parental rights to Child.

with Child and refused to address her own mental health issues. Based thereon, we conclude the trial court's findings support its conclusion that the conditions under which Child was removed from Mother's care would not be remedied.[5]

## 3. Child's Best Interests

In determining what is in Child's best interests, a trial court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of a child. *In re A.L.H.*, 774 N.E.2d 896, 990 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show that termination is in a child's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

To support its conclusion that termination of Mother's parental rights was in Child's best interests, the trial court found:

---

[5] Mother also alleges the trial court's findings do not support its conclusion that the continuation of the parent-child relationship posed a threat to Child's well-being. Because we hold the trial court's findings supported its conclusion that the conditions under which Child was removed from Mother's care would not be remedied, we need not consider Mother's argument regarding whether the continuation of the parent-child relationship poses a risk to Child's well-being. *See In re L.S.*, 717 N.E.2d 204, 209 (Ind. Ct. App. 1999) (because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the court needs find only one requirement to terminate parental rights), *reh'g denied, trans. denied, cert. denied* 534 U.S. 1161 (2002).

36. [Child] has been placed with the same foster family since removal in June of 2018 and she knows this as her home. [Child] is thriving in the foster home and is meeting or exceeding developmental goals. She has an established routine and her needs are met. She is bonded to her foster family. The plan is for her to be adopted by the foster family.

37. [Court Appointed Special Advocate, hereinafter "CASA"] Lindy Schubring supports termination of parental rights [as] in [Child's] best interests and believes that adoption by foster parents would give [Child] a safe and stable home. CASA reports that [Child] is bonded to Mother but is less carefree and energetic around her. CASA notes that neither parent has been able to demonstrate a consistent ability to provide for [Child].

(App. Vol. II at 17.) Mother argues "that she hasn't been provided every reasonable opportunity and that the case had not reached the 'last resort stage' as required. Until it had it can't be said that an outcome of termination was in the child's best interests." (Br. of Appellant at 28.)

[25] Child has been removed from Mother's care for over two years. When Child was removed from Mother's care, Mother did not have stable housing or employment and struggled with a diagnosed but untreated mental illness. Over the last two years, Mother has not participated in services designed to assist her with obtaining and maintaining suitable housing and employment, as well as appropriate treatment for her mental illness. Mother's lack of progress has kept her from advancing to unsupervised visits with Child.

[26] In addition, the CASA assigned to the case recommended termination because neither parent "has been able to demonstrate a consistent ability to provide for

[Child]." (App. Vol. II at 17.) We cannot leave Child in permanency limbo while Mother is given additional time to complete services in which she has been reticent to participate. *See In re Campbell*, 534 N.E.2d 273, 275 (Ind. Ct. App. 1989) (appellate court "unwilling to put [child] on shelf until [parents] are capable of caring for her appropriately"); *see also Baker v. Marion Cty. OFC*, 810 N.E.2d 1035, 1040 n.4 (Ind. 2004) (limitations on trial court's ability to approve long-term foster care are designed to ensure a child does not "languish, forgotten, in custodial limbo for long periods of time without permanency") (quoting *In re Priser*, No. 19861, 2004 WL 541124 at *6 (Ohio Ct. App. March 19, 2004)). Based thereon, we conclude the trial court's findings supported its conclusion that the termination of Mother's parental rights was in Child's best interests.

# Conclusion

[27] Mother has waived any challenge to the trial court's findings for failure to make a cogent argument. Waiver notwithstanding, regarding Finding 21, we conclude DCS provided sufficient evidence to support the trial court's finding that Mother was "fairly compliant" with her drug screens until August 2019, and then noncompliant thereafter. (App. Vol. II at 15.) Additionally, the trial court's unchallenged findings support its conclusions that the conditions under which Child was removed from Mother's care would not be remedied and that the termination of Mother's parental rights to Child were in Child's best

interests. Accordingly, we affirm the termination of Mother's parental rights to Child.

[28] Affirmed.

Robb, J., and Vaidik, J., concur.